284 So.2d 282

**Gary D. LUSCHEN**

v.

**STATE.**

**8 Div. 201.**

Court of Criminal Appeals of Alabama.

Oct. 16, 1973.

J. Robert Miller and Dan Moran, Hunts-
ville, for appellant.

William J. Baxley, Atty. Gen. and Samuel L. Adams, Asst. Atty. Gen., for the State.

HARRIS, Judge.

On September 30, 1971, appellant was convicted of murder in the first degree and his punishment fixed at death. The record came here on automatic appeal. It was submitted on briefs in this Court on April 25, 1972, and, subsequently assigned to one of the circuit judges to prepare an opinion. The record was returned to this Court on September 11, 1973, sans an opinion.

Appellant was represented in the trial court by appointed counsel who represents him on appeal.

Appellant was jointly indicted with Randall A. Shields for killing Robert Marlin Caneer, Jr., by stabbing him with a knife. A severance was granted and appellant was put to trial. At arraignment he entered two pleas: (1) not guilty, and (2) not guilty by reason of insanity.

On August 10, 1971, Honorable David R. Archer, one of the circuit judges of Madison County signed an order transferring appellant to Bryce Hospital to be examined by a commission of three qualified doctors to determine his sanity. On September 8, 1971, Judge Archer signed another order directing the sheriff to obtain custody of appellant from Bryce Hospital and return him to the Madison County jail and there confine him until released by legal process.

On the early morning of May 5, 1971, the deceased was found in a ditch on a public highway in Madison County wrapped in a sheet and blanket. He had thirty-three (33) knife wounds in his body. Some of the knife wounds were in his back, some in his chest, and others on both arms. According to an Assistant State Toxicologist, the cause of death was "hemorrhage produced by multiple and many stab wounds to the body, among which were injuries to the lungs and other major organs of the abdomen, including the liver and mesentery." Several photographs showing the various stab wounds were introduced in evidence over objections of appellant that they would inflame the jury and were highly prejudicial.

According to the evidence the deceased was living in an apartment with four other young men. He was not gainfully employed. In 1969 he was expelled from school because he wore long hair. He was a known drug pusher as well as a drug addict. In the beginning he dealt with marihuana, LSD and mescaline. Later, and at the time of his death, he sold and took heroin.

On the night of May 4, 1971, preceding his death on May 5, the deceased sold a fifteen-dollar ($15.00) bag of heroin to Randall Shields and one Ray Young. Shields and Young split the heroin and "shot it up". All of this took place at the apartment where the deceased lived with the other boys. At this time the deceased also took a shot of heroin. He took three or four shots of heroin during the evening. Shields and Young left the apartment in Shields' car and went to Young's apartment. The deceased followed on his motorcycle. When they reached Young's apartment, Young and his wife had an ar-

gument. Young didn't get the best of the argument and decided to drive away. He got in his own car and after driving a short distance he lost control of the car. The door flew open and he fell out. He was carried to the hospital by his wife and Mrs. Shields, the wife of the co-defendant, in Shields' car. According to Young he could not recall the events of the night before except, vaguely, the argument with his wife. Shields and the deceased remained at Young's apartment. It was at this apartment that the killing occurred.

Around 1:30 A.M. on May 5, 1971, Mrs. Shields returned to her apartment to get some fresh clothes and her purse. Appellant and Shields were there. Appellant said to Mrs. Shields, "You haven't seen me. You don't know me, and tell no one you saw me here today." Mrs. Shields left and went over to the Young apartment to get Mrs. Young's purse and some clothes for Mr. Young. When she arrived she found the deceased at the Young apartment. He was sitting on the couch in the livingroom and had the stereo playing. She looked on the coffee table and saw three or four open plastic bags and it appeared that someone had just "shot up" some heroin. This was the last time she saw Bobby Caneer alive. She left and returned to the hospital.

A search warrant was issued to search the Young apartment. This warrant was served on Young at the hospital and Young left the hospital with the police officer and a search of his apartment was conducted by several officers and Mr. Vann Pruitt, Assistant State Toxicologist. Blood stains were found on the couch in the livingroom, also on the floor, the walls, chairs, furniture, television set and on the inside of the back door. They found bloody towels and paper towels. An analysis of these blood stains was made and they were found to be Type O. The blood sample taken from the body of the deceased was also Type O.

The co-defendant, Randall A. Shields, appeared in court with his own attorney, Honorable Glenn Manning. Mr. Manning made the following statement in open court out of the presence of the jury:

"Randall Shields, your Honor, will waive or will testify as to any issues directly related to the charge under consideration at this time that is, the charge of homicide against Mr. Gary Luschen. He will not waive his privileges against self-incrimination as to any collateral issues, as to matters or things that might show the commission of some other crime than homicide, such as possession of drugs, something that is not related to this particular case."

Thereafter the following occurred:

"THE COURT: All right.

"MR. LOFTIN: If he is asked those questions, will you interpose an objection?

"MR. MANNING: We certainly will.

"THE COURT: Mr. Manning, do you propose to be in the courtroom while your client is on the stand?

"MR. MANNING: Yes, sir.

"THE COURT: And he understands his rights? You have explained them to him?

"MR. MANNING: Yes, sir."

As a witness for the state, Mr. Shields testified, in substance, that he was nineteen years of age and that on May 4, 1971, he lived in Apartment Number 2 on Minor Street; that he had known appellant about two months prior to May 4 and had known the deceased, Bobby Caneer, for several years; that on the night of May 4, he and Ray Young went to Caneer's residence for the purpose of buying heroin. During all of the years he had known Caneer, he had the reputation of being a dope or heroin dealer; that he had purchased dope from Caneer at least twenty times. Ray Young actually bought the pack of heroin from Caneer and they split it. Each used a syringe and needle and injected themselves.

Shields and Young stayed at Caneer's residence about thirty minutes after injecting themselves. Young offered Caneer a place to stay for the night. They left in Shields' car to go to Young's apartment. Caneer followed on his motorcycle. Upon arriving at Young's apartment, Young and his wife argued and Young got in his car and drove away. About a half block from home, he wrecked his car and was carried to the hospital by Mrs. Young and Mrs. Shields in Mr. Shields' car. Shields and Caneer stayed at the Young apartment and listened to music.

A short time later, appellant came to this apartment and said to Shields, "Do you want to do some heroin?" Shields answered affirmatively and went to the kitchen to get a spoon and some water. He did not witness the sale and purchase made between Caneer and appellant, but he and appellant took the heroin intravenously. Shields then left to go to his apartment and appellant followed. Caneer was then alone in the Young apartment.

Sometime later, probably around 2:00 A.M., Shields observed appellant to be extremely pale and wild-eyed. His movements were jerky and quick and he was acting wildly. Appellant told Shields that he was going back over to Ray's (Young) apartment and get his money back, "that the heroin was no good and that I was going with him and I said no, I didn't want to go over there. And he said yes, you are going to go over there with me." Appellant went into the kitchen and came out holding a butcher knife. They left and went to the Young apartment. Shields did not see Caneer when they walked in the apartment but he heard music playing. He went immediately to the bathroom and locked the door. A few seconds later, he heard Caneer say, "Why, man, why". About five minutes later appellant came to the bathroom door and said, "Get out of here, man. You've got to help me." When Shields opened the door, he saw appellant standing there with the knife in his hand and blood all over him. Appellant said, "I

killed him." Shields heard Caneer breathe what he supposed was his last breath.

Appellant told Shields that he must help him clean up the place and get rid of the body. They mopped up the blood with pillows, towels and other cloth materials they found in the apartment. Appellant handed Shields a sheet and blanket and both men wrapped these around the body. Appellant got his car and backed it to the back door of the apartment and together they picked up the body and placed it on the floorboard of the backseat. They drove up on Monte Sano Mountain to the Bankhead Parkway where they removed the body from the car and laid it in or near a ditch. They continued up Bankhead Parkway and turned off at the Toll Gate Road, and took a gravel road leading to a water tower where Shields threw out the blood soaked things they had used to mop up the blood.

They returned to the Young apartment and attempted to finish cleaning up the blood using paper towels. These towels were put in a paper sack and appellant carried the sack with him as they drove from this apartment. They went to Shields' apartment and Shields asked appellant to leave. Appellant told Shields that he had better not tell anyone about this and if he did appellant would kill Shields and his wife, and then he left.

Appellant was arrested at his apartment in the afternoon of May 5, 1971, after the body was discovered early that morning. He was given the *Miranda* rights and signed the following "Pre-interview Form":

"PRE–INTERVIEW FORM

"DATE: 5–5–71
TIME: 7:30 P.M.
PLACE: H'vle Police Dept.

"I, Gary D. Luschen of 2809 Newby Rd. Lot 47 being 24 years of age, hereby state and declare that I have been told by Det. J.C. Brooks H'ville Police Dept. that I may remain silent and do not have to make any statement whatsoever.

"Further, that should I make any statement, it can and will be used against me. I have also been advised that before I sign this form or make any statement, I have the right to talk with a lawyer of my own choice and/or anyone else, and to have such lawyer present with me during any questioning or statement which I may make.

"I have also been advised that if I am unable to hire a lawyer, a lawyer will be provided to represent me without cost to me and I may talk with him before I answer any questions or make any statement. Further, that I have the right to have this appointed lawyer present with me during any questioning or statement which I may make.

"I have further been advised that if I am willing to give a statement, I have a right to stop any time that I wish.

"With full understanding and knowledge of these rights, I hereby freely and voluntarily waive them by signing my name below. I am willing to answer any questions of my own free will, without force or fear, and hereby state by signing my name below that no threats or promises have been made to me by anyone. I wish to make a free and voluntary statement.

"I have completed ―― years of schooling.

"*I am able to read and write and I fully understand the meaning of all the above.

"This form has been read and explained to me and I understand the meaning of all the above.

   *    *    *    *    *    *

"s/ Gary Luschen
   Signature

"WITNESSES:
J.C. Brooks
Howard Turner"

After signing the "Pre-interview Form", appellant made a statement in his own handwriting on a form furnished by the Huntsville Police Department. This statement follows:

"Voluntary Statement Under Arrest

"DATE 5/5/71 TIME 7:30 P.M. PLACE Huntsville Police Dept.

"I, Gary Luschen, am 24 years of age and my address is 2809 Newby Road, Lot 47. I have been advised and duly warned by J. C. Brooks who has identified himself as Detective for City of Huntsville of my rights to the advice of counsel before making any statement, and that I do not have to make any statement at all nor incriminate myself in any manner.

"I hereby expressly waive my right to the advice of counsel, and voluntarily make the following statement to the aforesaid person, knowing that any statement I make may be used against me on the trial or trials for the offense or offenses concerning which the following statement is herein made.

"I declare that the following statement is made of my own free will without promise of hope or reward, without fear or threat of physical harm, without coercion, favor or offer of favor, without leniency, by any person or persons whomsoever.

"I went over to Ray Young's to see them Wednesday 12:30 on the 5 day of May. Randy and Bobby was there. We got a hit of dope from Bobby. Me and Randy split it. I went over to Randy's with him. We talked for a while then we went back to Ray's. I was standing by the couch. The next thing I knew I was stabbing Bobby. Randy was in the bath room. He came out and helped clean up everything. We put the body in the car and drove in the park somewhere Randy pulled him out of the car and put him in

(

the ditch then we drove down the street and Randy threw the blanket and other things in the ditch. We went back to Ray's house and tried to clean it up. Randy went home and I left too. I picked five bags of heroin off the coffee table.

"I can't say I am in my normal mind I need some medical help from a doctor. I would like to talk to one as soon as possible.

"I have read this statement consisting of one page and affirm to the truth and accuracy of the facts contained therein.

"This statement was completed at 7:45 P.M. on the 5 day of May 1971.

"Gary D. Luschen
Signature of person giving
voluntary statement

"WITNESS: J.C. Brooks 90
WITNESS: Howard Turner
Cary Wilburn 78"

When appellant was arrested, the officers requested permission to look around the apartment. Appellant gave his permission stating that he had nothing to hide. The officers also sought and obtained permission from Mrs. Luschen to search the apartment. The five bags of heroin that appellant said in his written statement he took off the coffee table in the Young apartment were found in a record player in the bedroom of appellant's residence but the trial court would not permit them to be introduced in evidence.

The only testimony offered for the defense was that of Dr. Steven L. Wolfgang, Chief of the Department of Psychiatry at the Redstone Arsenal. He was also engaged in the part-time practice of psychiatry in Huntsville and Scottsboro, Alabama. He interviewed appellant on two occasions for a total of about two hours. The history he obtained from appellant showed quite clearly that he had a seven-year drug history with multiple drug abuse, including heroin, amphetamines, LSD, morphine, cocaine and marihuana, which were taken both orally and intravenously.

The doctor first examined appellant on August 9, 1971, and again two days before trial. Based upon the history he obtained and his examination of appellant he was asked to render an opinion as to this man's mental condition on May 5, 1971, the day of the murder. The doctor testified:

"On the basis of my examination, made on two separate occasions, and also on the basis of the examination made under hypnosis, it appears to me that, according to what Mr. Luschen said, he had drank from five to eight beers and bloody marys and had also shot an undetermined amount of heroin into his blood stream immediately prior to the incident. When I say immediately prior, I would say this began at 11:00 P.M. with the drinking and that the heroin occurred, the shooting of the heroin occurred sometime between 12:00 and 1:00. It is quite clear to me on the basis of my medical examination and I feel I can state with a high degree of medical certainty that he was certainly under the influence of both alcohol and heroin at the time the murder took place."

"Q. Can you with any degree of medical certainty state at that particular time as to whether or not this defendant was suffering from any type of mental disease or disorder at that particular time?

"A. I feel that I can say with medical certainty that he was suffering from what would be called an acute organic brain syndrome."

He went on to say that the acute organic brain syndrome was probably complicated by a temporary psychosis, by which he meant at this point in time he felt that appellant had lost contact with reality. The doctor was asked if he had an opinion as to whether the defendant on May 5 could determine right from wrong. He said that was a very difficult question to answer but he didn't think at that particular time right

or wrong would have had any meaning to the individual.

The above was the strongest testimony the doctor gave in support of appellant's special plea of not guilty by reason of insanity.

To counter Dr. Wolfgang's testimony, the state produced Dr. William H. Goodson, Director-Psychiatrist of the Huntsville-Madison County Mental Health Board. Dr. Goodson examined appellant on July 27, 1971, and

"I concluded that Gary (Luschen) was a narcotic addict and that he had been abusing drugs of many kinds for several years and I concluded that he was not psychotic at the time I examined him in my opinion. I found that he was aware of the charges against him, aware of the possible consequences and that he was able to cooperate with his defense. In my opinion, from having talked to him and got his report about the circumstances at the time of the alleged offense, my best opinion was that he was able to distinguish right from wrong at that time."

The test of insanity as laid in Parsons v. State, 81 Ala. 577, 2 So. 854, was not met in the instant case but, nevertheless, the trial court submitted that issue to the jury and the jury resolved that issue against appellant.

■ Appellant contends that Title 30, Section 63, Code of Alabama 1940, relating to special venires in capital cases is mandatory. The provisions of this section have no application to Madison County. The selecting and impaneling of juries in Madison County are controlled by Title 13, Section 125 (90h) Code of Alabama 1940, Pocket Parts.

■ There was no error in the admission in evidence of photographs of the dead body of Mr. Caneer showing his wounds. Mathis v. State, 280 Ala. 16, 189 So.2d 564; Boulden v. State, 278 Ala. 437, 179 So.2d 20; Hurst v. State, 277 Ala. 686, 174 So.2d 325; Chappelle v. State, 267 Ala. 37, 99 So.2d 431.

■ Appellant insists that the trial court committed reversible error in admitting in evidence the extra-judicial confession made by appellant. It is true that an extra-judicial confession is prima facie involuntary and inadmissible, and the duty rests in the first instance on the trial court to determine whether or not the confession is voluntary and unless it so appears, it should not be admitted. Myhand v. State, 259 Ala. 415, 66 So.2d 544; Duncan v. State, 278 Ala. 145, 176 So.2d 840, 855–856.

■ The record shows that, before the inculpatory statements were admitted, the state introduced evidence showing that neither threats were made nor coercive actions of any kind were taken against appellant; that he was not physically threatened; and that no offer of reward or inducement or promise of any kind was made to him to get him to make the statement. The only testimony even tending to show the contrary was that given by appellant on voir dire out of the presence of the jury. His testimony is not at all convincing. He was given the *Miranda* warnings on several occasions and while one or more may not have been as full and complete as they might have been, it is certain that at least one of the warnings met every test and requirement of the law. On the record before us, we hold that appellant knowingly and intelligently waived his right to counsel, and knowingly and voluntarily wrote the confessory statement. Embrey v. State, 283 Ala. 110, 214 So.2d 567.

The written statement of defendant in the nature of a confession was properly admitted where it included a statement that it was voluntary. Merrell v. State, 21 Ala.App. 38, 104 So. 881.

■■ Appellant claims error was committed in the admission of state's Exhibit No. 1, a photograph taken of the deceased three weeks prior to his death. The contention is made that the sole purpose of at-

tempting to make an identification of the deceased by this photograph was to place a bereaved mother on the stand and introduce a rather angelic looking photograph of her then-living son, and thus build in the jury, at an early stage in the proceedings, a sense of outrage against appellant. It is settled law that a photograph of a deceased person taken before his death may be introduced in evidence for identification purposes. Malachi v. State, 89 Ala. 134, 8 So. 104; Boulden v. State, 278 Ala. 437, 179 So.2d 20. Laying aside these authorities, there was no objection to the introduction of this photograph.

Numerous objections were made to the closing arguments made by the district attorney and his assistant. In each instance the trial court sustained the objections and instructed the jury to disregard such arguments. The action of the court cured any possible error. Coats v. State, 253 Ala. 290, 45 So.2d 35; Mandell v. State, 21 Ala.App. 404, 108 So. 635; De-Franze v. State, 46 Ala.App. 283, 241 So.2d 125.

This was a cold-blooded and senseless murder without any extenuating circumstances. Appellant was accorded a fair and impartial trial with all of his constitutional rights fully protected.

The sentence of death imposed upon appellant is vacated and set aside. The sentence is corrected to provide that Gary D. Luschen be imprisoned in the state penitentiary for the term of his natural life. The Clerk of this Court shall furnish a certified copy of this order to the Clerk of the Circuit Court of Madison County, and the Clerk of that Court shall issue a commitment in this case based upon this sentence of life imprisonment and shall forward the commitment to the Board of Corrections.

Except as to the death sentence, the judgment of the Circuit Court is affirmed. As to the death sentence, the judgment of the Circuit Court is modified and the sentence is hereby reduced to life imprisonment, and as so modified, the judgment is affirmed.

Modified and affirmed.

All the Judges concur.