304 So.2d 617

**Dave Mack HUMPHREY**

v.

**STATE.**

**8 Div. 492.**

Court of Criminal Appeals of Alabama.

Oct. 29, 1974.

Rehearing Denied Nov. 26, 1974.

William J. Baxley, Atty. Gen., and Carol Jean Smith, Asst. Atty. Gen., for the State.

Newton & Coar, Birmingham, for appellant.

HARRIS, Judge.

Appellant was convicted of rape and his punishment fixed at thirty-five years in the penitentiary. The judgment of the court was in accordance with the verdict of the jury. Appellant was found to be indigent, and counsel was appointed to represent him both at arraignment and trial under a plea of not guilty. He was furnished a free transcript, and trial counsel was appointed to represent him on appeal. Counsel was notified that appellant had *retained* a law firm in Birmingham to handle the appeal.

This is another interracial rape case that is fast becoming commonplace in the unrelenting rise in the crime rate in this state and nation.

The prosecutrix was a student at the University of Alabama at Huntsville. On January 3, 1973, around 1:00 p. m., she drove her automobile to the apartment of her boyfriend at 4311 Holmes Street near the campus of the University to study for a history examination. Her boyfriend left the apartment unlocked as he knew she was coming there to study. After an hour or so, she got sleepy and decided to take a nap on her boyfriend's bed. She was fully clothed as she went to sleep. Her outer clothing consisted of an undershirt, sweater, blue jeans and socks. About an hour later, her boyfriend and a friend of his came in the apartment and stayed about five minutes and left to go pay the rent. She remained in bed and was dozing. She heard someone come in the apartment and walk around. This person opened the bedroom door, and she pretended to be asleep. She was fully awakened when this person touched her shoulder. She saw a black man standing by the bed. The man asked her if she had any dope and she said, "No, wait until Bill comes back." The man grabbed the prosecutrix by the arms and pulled her to a half sitting position. He told her to take her pants off and she said, "You are crazy." She was frightened and terrified and he told her again to "Take your pants off." She unbuttoned the top button to her blue jeans and was looking toward the door to see if she could escape. She started to get up, and the man put his hand over her mouth. He grabbed her blue jeans and snatched them off and in so doing popped a button off. Then he took her underpants off and raped her. During the intercourse, he told her he had never had a white woman and just wanted to try one. According to the prosecutrix the man climaxed in about thirty seconds and ran out of the apartment.

She got dressed and went out the back door, got in her car and started to police headquarters and decided that would take too long. She drove to the University and got someone to call the Police Department. In a few minutes, a detective and two patrolmen came to the office at the University where she was waiting. She told the

officers what had happened to her and gave them a description of her assailant. She told the officers the black man was in the bedroom with her at least four to five minutes; that she got a good look at his face, but mostly from an angle in broad daylight. She described her assailant as being of light brown complexion and having a mole on his right cheek. He was of medium build and wearing dark clothes. He had an afro type hair style in a conservative sort of way. Prosecutrix' boyfriend drove her to the hospital where she had to wait a couple of hours before a doctor came to examine her. A gynecologist examined her at 7:45 that night and testified, "I did a pelvic examination and found no evidence of trauma to the vaginal area. I took two smears for spermatozoa and she had no other complaints except some abdominal pain." He testified that he found sperm in the urine and in his opinion she had had intercourse within twelve hours prior to his examination.

There had been a series of such rapes in Huntsville during a period of several months, both before and after prosecutrix was raped. Appellant had become a suspect in a number of these offenses. He was picked up by two detectives at a grocery store near the campus of the University and was carried to headquarters for interrogation. On the way to the station house, he was given the *Miranda* rights and warnings by reading him a card now carried by all police officers. He was not questioned on the way to headquarters.

At the station house, another police officer told appellant that they were investigating several rapes that had occurred recently and that he was a suspect. This officer further told appellant that a lineup would be conducted, and he was going to be placed in the lineup with a number of other black males who closely resembled him as to height, weight, dress and color. Appellant asked what would be the result of this lineup, and he was told that witnesses and the rape victims would be brought to view the people in the lineup and if he was identified as the offender, he would be charged in each case, and if he was not identified, he would not be charged in any case.

From the record:

"Mr. Humphrey stated to me or asked me rather if he could make a phone call. I advised him he could. I asked him if he knew his number or did he need a phone book, he said he knew the number he wanted to call, that it was A & M College, and he wanted to talk to Dean Bright who was his golf coach. I told him he could, and he said, 'If I can talk to my coach, I don't think you will need a lineup.' And he made the phone call, talked to someone on the other end and he told me it was Dean Bright and he was coming to Police Headquarters."

The suspect said he wanted to talk to Dean Bright, and that he did not want a lawyer.

Following this telephone call appellant was carried to another office to await the arrival of Dean Bright, and no other questions were asked him by the officer. Bright came to headquarters and had a conversation with the officer out of the presence and hearing of the suspect, and,

"I told Mr. Bright in reference to some of our cases we were investigating, and I told Mr. Bright I was wanting to talk to Mr. Humphrey and Mr. Humphrey had requested to talk to him, and I told him our suspicions in the cases, that he was a suspect in the cases and that I was going along with his request to allow him to talk to him. And he asked could he talk to him alone for a few minutes and I gave him that permission. We went into the room where Dave Mack was and Mr. Bright sat down and I sat down. And the first thing I did after sitting down was take out a card that I use to read a person their rights under the Constitution."

After reading appellant the *Miranda* rights and warnings, the officer asked him if he knew his rights and got an affirma-

tive answer. The officer then said, "with these rights in mind, do you wish to talk to me?" Appellant said he wanted to talk to Dean Bright first. The officer presented to appellant a printed rights waiver form and told him to look over the form along with Dean Bright while he was out of the room and decide in the presence of the Dean if he wanted to sign the form and give him a statement in connection with the cases. The officer then left the room.

Fifteen to twenty minutes later, Bright came out into the hallway and told the officer that appellant was ready to talk to him. The officer and Bright returned to the interrogation room and the officer asked appellant if he understood his rights and if he wished to make a statement. Appellant said he understood his rights and was ready to talk. The officer said he wanted appellant to sign the form before he made any statements. Bright told the appellant to sign the form and tell the officer the truth. The waiver of rights form was signed by appellant and witnessed by the officer and "Gene Bright, Dean of Men." Whereupon, appellant made an oral confession to the officer in the presence of Dean Bright.

The officer asked Humphrey to state in his own words the cases or case that he was involved in, and he replied, "I did that one on Holmes Avenue, I parked my car about 200 yards from the place, I went in the back door, the girl was alone. I raped her." The officer asked him if he reached a climax in this girl and he said, "I don't quite understand what you mean by reach a climax," and the officer said, "possibly the words you use may be different from mine, what 1 am talking about—maybe Dean Bright can help in this area." Dean Bright spoke up and said, "Dave, did you —————— —————— in the girl?" Dave said, "I used a ————." Humphrey went on to say that he raped the girl, he didn't hurt her, he got up and left, got in his car and left the scene.

In the presence of Bright, appellant continued, "I went into the house on East Clinton Street about 1:30 in the morning. I went upstairs." He said he saw this girl laying in the bed and he was going to rape her in bed. He heard some movement and thought someone was coming up the stairs. He got scared and ran by someone as he was coming down the stairs. He went back out the window and left the scene.

During this same interview the officer asked appellant if he was involved in any of the other cases mentioned by the officer and he said these were the only two cases in which he was involved. The officer then told appellant that they were going to hold a lineup, and that if the victims in these other cases picked him out in the lineup he would be charged in each individual case. The officer further told appellant, and Dean Bright, that for the present he would be officially charged with two counts, one for rape at the Holmes Avenue address, and one for first degree burglary at the East Clinton Avenue address. Dean Bright asked about tthe bond procedure, and the officer said he did not know anything about the bonds. He said warrants would be issued in these two cases and appellant would be transferred to the county jail, and it would be up to a judge to determine the matter concerning bonds. Dean Bright said he had to go back to school and left.

After Bright left, appellant told the officer he wanted to call his mother and let her know he would not be coming home. He was permitted to call home, and he made several more telephone calls. When appellant made his calls, the officer asked him if he minded putting the statement he gave the officer orally, in the presence of Dean Bright, in writing in his own words, and he agreed to do so. He signed a statement with reference to these two cases *printed* in his own handwriting. He *printed* his signature and the officer asked him to sign the statement with his usual signature, and he complied with the request. The officer initialed this change. The statement which appellant printed differs in verbiage from the oral statement made

to the officer in the presence of Dean Bright, but the officer did not suggest any changes. The *print out statement* was a confession to both crimes.

After the confession was signed, appellant was asked to get in a patrol car and show the officers the house on Holmes Avenue where he raped the girl, and the house on East Clinton Avenue that he entered at 1:30 A.M. He accompanied the officers and pointed out both houses without any prompting. He was carried back to jail and locked up.

The next day a lineup was conducted. There were six black men in the lineup, and they were dressed in uniforms that were exactly alike. Each had a card in his hand numbered 1 through 6. The prosecutrix in this case, the girl on East Clinton Avenue, and another rape victim viewed the lineup. Appellant was number 3 in the lineup looking from left to right. Prosecutrix looked at the lineup, instantly identified appellant and wrote number "3" on a piece of paper and handed it to a detective. The other rape victim also identified appellant. The girl on East Clinton Avenue did not get a good look at the man who entered her bedroom at 1:30 A.M., except she knew he was black. She did not identify anyone in the lineup. At trial prosecutrix pointed to the defendant and made a positive in-court identification of the man who raped her on the afternoon of January 3, 1973, independent of the lineup identification which was ruled inadmissible by the trial court.

A voir dire hearing was held out of the presence and hearing of the jury to determine the voluntariness vel non of appellant's oral and written confessions. At this hearing the interrogation officers, appellant and Dean Bright testified, and at the conclusion of this hearing, the trial court ruled the confessions were knowingly, voluntarily and intelligently made and were admitted in evidence.

Appellant's defense was an alibi. His brother testified that he got home from school about 3:20 on the afternoon of the alleged rape and found appellant asleep on the couch; that he waked him at 4:10 P. M. to take him to his job, as the brother wanted to use appellant's automobile to carry their mother to the grocery store. He said he rode with his brother to the place of his employment arriving there around 4:25; that appellant owned a 1965 White Ford Custom Four-Door, and after reaching his jobsite, he surrendered his automobile to the brother. The brother said he saw appellant actually enter the building where he was employed, and he did not see appellant again that day. He said that when appellant was working sometimes he would get home at 10:00 P. M., and at other times it would be 3:00 A. M. before he got home.

The office and personnel manager of the company where appellant worked testified that she had examined the records of the company and that on January 3, 1973, appellant clocked in for work at 4:20 P.M. and clocked out at 3:00 A.M. the next morning. She further testified that she did not see him check in or check out on that date. She said she was going only by the records.

Over objections of appellant, the state in rebuttal offered the testimony of the other rape victim and the girl living on East Clinton Avenue.

This rape victim testified that she was married and living with her husband in an apartment on Whitesburg Drive in Huntsville; that on the night of December 23, 1972, her husband had gone to a Christmas party. She went to deliver some Christmas gifts and returned home around midnight and locked the doors. She wrapped some more gifts, did some cooking, took a bath, put on a long night gown, rolled her hair, unlocked the front door so her husband would not have to wake her, and went to bed. She thought the time was 2:00 A.M. She was tired and dozed right off to sleep. Sometime later, she heard someone enter the apartment. She called

her husband's name and got no answer. She got out of bed and walked to the bedroom door leading into the hall. The hall was well lighted and she saw a black man standing in the hall. She got a good look at him and started screaming. The man grabbed her and forced her on the bed and got on top of her. She was still screaming and he kept telling her to shut up, but she became hysterical. He started beating her in the face with his fists trying to get her to hush, but she couldn't stop hollering. He kept beating her in the face and she tasted blood in her mouth. He finally subdued her, took his pants off, pulled up her gown and raped her. She kept trying to push him off her and finally pushed him out of her as he was ejaculating, and his semen got on her person and on the bed sheet. He then put on his pants and asked her if she had any money. She only had $5.00 in her pocketbook, and she handed her pocketbook to him. He took the money and ran out of the apartment. She viewed the lineup and unhesitatingly identified appellant. She made a positive in-court identification.

The seventeen-year old girl on East Clinton Avenue viewed the lineup but was unable to identify appellant because it was dark in her room when a black man got in bed with her. She testified that she lived with her parents, two younger brothers, and a little sister; that on February 11, 1973, she went to bed in her upstairs bedroom around midnight and soon fell asleep. She woke up and saw a man standing about five feet from her bed, and before she could scream, the man was on top of her and put his hand over her mouth. She further testified:

"He was on top of me and he had his hand over my mouth. And then he put his hand between my legs and then he tried to kiss me and I moved away, and he put his hand back over my mouth, then he put his other hand on my neck and said he was going to break my neck. Then he took me off the bed and got to the floor, and he said, 'Let's get down on the floor,' and that's when he got up and went out of the room."

She said as soon as the man went out of the room she started screaming, and her mother came upstairs. The man passed her mother on the staircase. The girl went to the window, and it was light outside and she saw the man get in a 1966 White Ford Four-Door automobile, which he had parked in front of her car, and drive away. She was unable to give any description of her assailant except to say that he was black and was about five feet, eleven inches tall. Her description of the automobile was precisely like appellant's brother's description except the year model. The brother said it was a 1965 model and she said a 1966 model.

At the conclusion of the testimony of these two rebuttal witnesses, appellant moved to exclude their testimony without stating any grounds in support of the motion. The court overruled the motion.

Appellant urges a reversal on the following grounds: (1) His confession was not shown to be voluntary; (2) He was not represented by counsel at the pretrial lineup; (3) The in-court identification was based upon the lineup identification at which counsel was not present, and (4) The court erred in admitting in evidence other, separate and independent offenses.

■ An extrajudicial confession is prima facie involuntary and inadmissible, and the duty rests in the first instance on the trial court to determine whether the confession is voluntary, and unless it so appears, it should not be admitted. Myhand v. State, 259 Ala. 415, 66 So.2d 544; Duncan v. State, 278 Ala. 145, 176 So.2d 840, 855, 856.

■ The evidence in this case clearly established that prior to signing his "print out" confessory statement, appellant signed a pre-interview form acknowledging that he had been advised of all of his constitutional rights and expressly waived them, and knowingly and intelligently waived his

right to counsel, and knowingly and intelligently signed the confessory statement. He asked and was granted permission to use the telephone to call the Dean of Student Affairs at A & M College, where he was a student, saying that after he talked to the Dean it would probably be unnecessary to hold a lineup. In response to appellant's call, the Dean came to the station house and conferred privately with appellant for thirty to forty minutes. The Dean left appellant in the conference room and went in the hall and told the officer in charge that appellant was ready to talk now. The officer and the Dean returned to appellant, and the officer said that before asking any questions he wanted the waiver of rights form executed. The Dean told appellant to sign the form and tell the officer the truth. Appellant signed the form and his signature was witnessed by the officer and the Dean. Appellant then made an oral confession which he later reduced to writing—minus some details. The state laid the proper predicate for the introduction of the inculpatory statement. We hold that appellant knowingly and intelligently waived his right to counsel, and knowingly and voluntarily made and signed the confessory statement. Embrey v. State, 283 Ala. 110, 214 So.2d 567; Luschen v. State, 51 Ala.App. 255, 284 So.2d 282; Jones v. State, 292 Ala. 126, 290 So. 2d 165; Guenther v. State, 282 Ala. 620, 213 So.2d 679.

With reference to appellant's second and third claim of error, it is only necessary to say that under the rule of Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411; Thomas v. State, 50 Ala.App. 227, 278 So.2d 230; Houston v. State, 49 Ala.App. 403, 272 So.2d 610, the presence of counsel is not required at a lineup conducted before indictment.

There are two other reasons why no error intervened here. One, the trial court, on motion, excluded all testimony relating to the lineup, and, two, the in-court identification of appellant by his rape victims was not tainted by the identification made at the lineup. This is another clear case on "independent source." Robinson v. State, 45 Ala.App. 236, 228 So.2d 850; Grace v. State, 44 Ala.App. 682, 220 So.2d 259; Hannon v. State, 48 Ala.App. 613, 266 So.2d 825; Smith v. State, 49 Ala.App. 147, 269 So.2d 164.

We come now to appellant's fourth claim of error. The general rule is that evidence of distinct and independent offenses are not admissible in the trial of a person accused of a particular crime. However, there are well-recognized exceptions to this rule, and one of paramount importance is the "identity exception."

"These recognized exceptions to the general rule have developed into general categories and are listed in Wharton's Criminal Evidence, Section 31, as follows:

'These exceptions fall under the following general divisions: (1) Relevancy as part of res gestae. (2) Relevancy to prove identity of person or of crime. (3) Relevancy to prove scienter, or guilty knowledge. (4) Relevancy to prove intent. (5) Relevancy to show motive. (6) Relevancy to prove system. (7) Relevancy to prove malice. (8) Relevancy to rebut special defenses. (9) Relevancy in various particular crimes. It is recognized that in many instances the line of demarcation is not clear, but the discretion vested in the trial judge, intelligently and considerately exercised, will enable the prosecution fully to present the charge, on the one hand, to protect the accused and secure to him the rights guaranteed to him by the Constitution and the laws.'

"From Wilkins v. State, 29 Ala.App. 349, 197 So. 75, we take the following as expositive of the very issue, and only issue, presented on this appeal:

'* * * It is a well-established common-law rule that in a criminal prosecution proof which shows or tends to

show that the accused is guilty of the commission of other crimes or offenses at other times, even though of the same nature as the one charged in the indictment, is incompetent and inadmissible for the purpose of showing the commission of the particular crime charged unless the other offenses are connected with the offense for which he is on trial. In other words, proof of such collateral offenses cannot be used as substantive evidence to establish the guilt of the accused as to the crime charged. 20 Am.Jur., Section 309, pp. 287, 288. Wharton's Criminal Evidence, 10th Ed., Volume 1, Section 30, p. 59. This well-established principle of criminal evidence, however, is subject to several, equally well-established exceptions, which include cases where intent or identity is involved. As found in 22 R.C.L., Section 39, p. 1204: "But this general rule is not to be followed blindly and evidence rejected on the sole ground that it does show the commission of another crime. If evidence is relevant and competent it should be admitted regardless of its incidental effect. Accordingly it is held that evidence of another crime is admissible where it tends to identify the accused."

'And we also add that such evidence should also be admitted where it tends to show the intent with which the act was done. Or as stated in Underhill's Criminal Evidence, 4th Ed., Section 181, p. 318: "To this general rule there are several distinct exceptions which have been permitted *from absolute necessity, to aid in the detection and punishment of crime*. These exceptions ought to be carefully limited and guarded by the courts and their number should not be increased. But it must be admitted that the *modern* tendency on the part of the courts is to *be liberal* in the admission of evidence of collateral crimes. The exceptions to the general rule arise either from the necessity of the case or the nature of the offense, as for example, * * when the *intent* or motive is to be proved from the circumstances, or where the *identity* of the accused is expressly in issue." (emphasis added)'

"These exceptions to the general rule have become so embedded in the judicial fabric of the jurisprudence of this State that further citation of authorities would seem to be unnecessary. But for a collection of these authorities, see Weatherspoon v. State, 36 Ala.App. 392, 56 So.2d 793."

The trial judge was thoroughly familiar with the exceptions to the general rule, and in his oral charge to the jury, he was careful in limiting the effect of the testimony of the other rape victim and the seventeen-year old girl.

The court charged the jury on this matter as follows:

"There is one matter, and that is the testimony of two witnesses, the witness Rita Wilson and the witness Connie Whitt. The Court wants to instruct you particularly about the testimony of those two witnesses. This defendant is standing trial charged with the offense of the rape of Margaret Caffey, he is not charged with any other offense, whether he committed any other offense or not is not a material part of your consideration. The very reason that the Court keeps you together, the very reason that the Court doesn't let you read newspapers or view television accounts is because those accounts might have in them some other offense of which the defendant is not being tried and by virtue of the fact that you became aware of some other offense you might then take the fact that he is charged in more than one case and say that has a bearing on his guilt. It does not, and the Court instructs you that it does not. You cannot try a man but for one offense and your only concern is this offense. With that preface, with regard to the testimony of

the other two witnesses, you are to consider it solely and only for the purpose of identification of this defendant. The defendant has raised a defense that he is not guilty. He has offered in support of that an alibi, he has offered in support of that questions of his positive identification. The Court allowed that evidence to be presented to you only for the question of you determining whether or not this defendant is guilty of this offense, and whether or not the identification of this defendant is positive. So the testimony of those witnesses you are to take only as it relates to whether or not this defendant is the defendant charged with this offense. * * *"

We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. The case is affirmed.

Affirmed.

TYSON and DeCARLO, JJ., concur.

CATES, P. J., and ALMON, J., dissent.

CATES, Presiding Judge, and ALMON, Judge, dissenting.

We do not think that it was proper to admit testimony of other crimes. Mason v. State, 259 Ala. 438, 66 So.2d 557, 42 A.L.R.2d 847, is the leading case.

In sexual offenses Brasher v. State, 249 Ala. 96, 30 So.2d 31, lays down the principle that offenses committed by accused against third persons merely tending to show disposition, inclination, propensity or depravity, does not come within the identity exception to the general rule against admissibility of proof of other crimes.

*Brasher,* supra, was expressly referred to in Durham v. State, 287 Ala. 731, 250 So.2d 696, in the Chief Justice's dissenting opinion. From that reference we consider that our senior brethren approved again the *Brasher* rationale. In Noble v. State,

253 Ala. 519, 45 So.2d 857, Foster, J., wrote, in part:

"So that we are now distinctly in the status of holding that there must be something in the two cases to show a relevant connection such as some peculiarity in them applicable to defendant *not generally obtaining,* or some relevancy to the pending issue other than to show the moral delinquency of defendant." [Italics added.]

Judge Almon and I consider that the wished-for relevant connection is not here present. Respectfully we dissent.

Finally:

"The worst wretch that walks the earth is entitled to a fair trial, for the law is superior to all persons. As much as we may regret some results of the law, the law must be preserved if this constitutional democracy is to survive." Watts v. State, 282 Ala. 245, 210 So.2d 805.