HARRIS, Judge.
Appellant was convicted of murder in the first degree, and the jury fixed his punishment at life imprisonment in the penitentiary. With counsel present at arraignment appellant pleaded not guilty. After conviction he gave notice of appeal. The trial judge determined appellant to be indigent and he was furnished a free transcript. Trial counsel was appointed to represent him on this appeal.
The sufficiency of the evidence to support the judgment of conviction is not presented to this Court. There was no motion to exclude the State’s evidence; there was no request for the affirmative charge or any other written charges; there was no motion for a new trial and no exceptions were reserved to the oral charge to the jury.
The evidence presented by the State made out a clear-cut case of murder with no mitigating or extenuating circumstances. Appellant claimed self-defense stating that just before he fired the shotgun toward the deceased, he saw what appeared to be a pistol in his hands as he started to get out of his automobile when both were stopped on the road.
O. D. Fletcher, who lived in the Harvest Community of Madison County, testified that on May 9, 1976, the deceased came to his home driving his automobile. After being there for a while they decided to go and get some beer. The deceased was driving and Fletcher was in the front seat on the passenger’s side and one Robert Sumners was in the back seat directly behind the deceased. On the way to get the beer, they met appellant in his automobile and he stopped and flagged the deceased down. Appellant got out of his automobile with a .20 gauge shotgun and pointed it at the head of the deceased and ordered him out of the car. The deceased refused to get out. Both Fletcher and Sumners got out and walked to the back of the car and Fletcher started pleading with appellant not to shoot the deceased. Then appellant pointed the gun at Fletcher and he stepped back out of the way. Appellant then told the deceased, “I have been looking for you all day to kill you. I told you last night I was going to kill you when I saw you.” Again he ordered the deceased out of his car. Instead of getting out of the automobile the deceased started pulling off slowly and appellant hollered at him and told him to stop but he would not stop, and appellant ran up beside the automobile and put the gun in the window of the car and shot one time. The deceased drove on down the road to Lockhart’s, some short distance away, stopped his automobile and fell out onto the parking lot of the store. Fletcher went to his home nearby to get his car to pick up the deceased to take him to the hospital. When he got back to where the deceased was lying, there were several people present and some of them had cut one of the pants legs of the deceased and had tied it around the wound to try to stop the bleeding. Fletcher was told not to move the deceased as an ambulance had been called.
While waiting on the ambulance Fletcher saw appellant drive by the store where the deceased was lying, on two occasions, but he did not stop. Fletcher remained at the scene until the ambulance came and also the police. He observed the ambulance attendants administering to the deceased inside the ambulance but he did not know what they were doing.
The police officers asked him what had occurred and he told them that appellant had shot the deceased and he went with the police to the ball park where they found *236 appellant. He was present when the officers arrested appellant and read him his constitutional rights.
Fletcher further testified that there was no weapon of any kind in the automobile of the deceased, nor did he have a weapon on his person. He stated that no one went around the automobile driven by the deceased after he parked it at the grocery store. He stated that while appellant was ordering the deceased to get out of the car, the deceased reached over and picked up a cigarette lighter and lit a cigarette and appellant hollered at him not to pick up a gun and the deceased told appellant he did not have a gun and to please go on and let him alone.
Dr. Tom R. Key testified that he was a practicing physician in Guntersville, Alabama, but on May 9, he was working in the emergency room of the Huntsville Hospital when the deceased was brought in by the ambulance. He testified that he had been in communication with the ambulance attendants by radio and had advised them to start I.V. or saline solution en route to the hospital. He said that he first saw the deceased in the emergency room at 2:22 p. m. on May 9, 1976, and in the emergency room with him at the time was Dr. Rao Kakani, who was a vascular surgeon in Huntsville and that both of them administered treatment to the deceased but that he had lost so much blood from the time that he was shot until he reached the hospital that they were not able to save his life. He further testified that the deceased was shot in one of his legs near the knee area and that the wound was so traumatic and extensive that he would have lost his leg even if he had lived. He said that the deceased died as the direct and approximate consequence of the gunshot wound to his leg causing him to bleed to death. He said the entrance wound was on the medial aspect and the exit wound was actually behind the knee so that this whole area behind the knee in the bend of the knee was gone.
Annie Miller testified that she was an eyewitness to the shooting and stated that she lived on the road near the place where appellant stopped the deceased’s car; that she heard the deceased tell the appellant that he didn’t want any trouble but that she saw appellant put the shotgun inside the window of the car and fire one time, that she saw the deceased slowly drive away from the place of the scene of the shooting and saw appellant get back in his automobile and drive away.
Earl Williams testified that he was an Investigator with the Madison County Sheriff’s Department and on May 9, 1976, around 1:40 p. m., he went to the scene to investigate the shooting; that he talked to O. D. Fletcher and to Robert Sumners. He stated that he checked the automobile driven by the deceased and did not find a weapon of any kind and he also checked the victim and found no weapon of any kind on his person. That O. D. Fletcher told him that appellant had gone to the ball park and he and some other officers, including Investigator Crowell, went to the ball park and arrested appellant.
Frank Crowell testified that he investigated the shooting and took several photographs of the scene of the shooting, the body of the victim and the victim’s automobile, and that he found no weapons of any kind in or around the victim or in or around the victim’s car; that he arrested appellant at the ball park and read him his Miranda rights from a card and asked him if he understood his rights and he answered in the affirmative by nodding his head up and down. The appellant’s father was present at the time he was arrested and when the officers asked where the gun was, appellant’s father stated that the gun was in the automobile and that he was part owner of the automobile. Investigator Crowell got the shotgun, tagged it, and put it in the evidence room under lock and key where it remained until the day of trial where it was produced in court, identified, and admitted into evidence.
Crowell further testified that on May 10, 1976, Officer Leon Greene in his presence gave appellant the Miranda rights and warnings again. That there were no threats of any kind made; neither were *237 there any promises, .inducements, rewards or hopes of rewards made to appellant to get him to make a statement and that he gave a statement concerning the shooting. He further stated that a waiver of rights form was given to appellant and it was read to him and appellant said he understood his rights and he signed the waiver and he subsequently signed and initialed each page of the confessory statement.
A voir dire hearing was held out of the presence and hearing of the jury and at the conclusion of this voir dire hearing the Court determined that the confession was knowingly, voluntarily and intelligently made and it was admitted into evidence.
The confession is as follows:
“VOLUNTARY STATEMENT (UNDER ARREST)
“DATE 10 Mav 1976 TIME 2:49 PM PLACE Huntsville. Ala.
“I, Willie Edd Harden. AM 38 YEARS OF AGE AND MY ADDRESS IS Rt 1. Box 977. Harvest. Ala. I HAVE BEEN ADVISED AND DULY WARNED BY Leon Greene. WHO HAS IDENTIFIED HIMSELF AS Investigator. Sheriff Dent. OF MY RIGHT TO COUNSEL BEFORE MAKING ANY STATEMENT, AND THAT I DO NOT HAVE TO MAKE ANY STATEMENT AT ALL, NOR INCRIMINATE MYSELF IN ANY MANNER. I HEREBY EXPRESSLY WAIVE MY RIGHT TO THE ADVICE OF COUNSEL, AND VOLUNTARILY MAKE THE FOLLOWING STATEMENT TO THE AFORESAID PERSON, KNOWING THAT ANY STATEMENT I MAKE MAY BE USED AGAINST ME ON THE TRIAL OR TRIALS FOR THE OFFENSE OR OFFENSES CONCERNING WHICH THE FOLLOWING STATEMENT IS HEREIN MADE. I DECLARE THAT THE FOLLOWING STATEMENT IS MADE OF MY OWN FREE WILL WITHOUT PROMISE OF HOPE OR REWARD, WITHOUT FEAR OR THREAT OF PHYSICAL HARM, WITHOUT COERCION, FAVOR OR OFFER OF FAVOR, WITHOUT LENIENCY OR OFFER OF LENIENCY, BY ANY PERSON OR PERSONS WHOMSOEVER.
“W.E.H. Friday night, 7th of May, I went to get some parts for my car. L. B. Fletcher, Jackie Jones and Emma Mae Leslie were in my car with me. Emma Mae is Alan Leslie’s ex-wife. After I got the parts, I drove to Nathan Fields shop by Toney to get my car fixed. Alan Leslie was there at the shop and saw his ex-wife in the car with us. Alan didn’t say anything to me or anyone else in the car. I didn’t see Alan any more until Saturday evening at the same shop when I went back to get my car fixed again. Alan began cussing me out, I guess because of his ex-wife. Alan left, saying he was going to get his gun. Fields told him not to come on his property any more if he was going to bring a gun. I saw Alan again that night about nine or nine-thirty at Robert Mathews’ house. Alan began cussing at me again and told me if I wanted that damn woman I could go on and have her. I just got up and left out. W.E.H.
“W.E.H. I didn’t see Alan any more till Sunday morning. I figure it was about eleven or eleven-thirty, I didn’t look at my watch but I know it was early. I met Alan in his car going the opposite direction on a road right off Lockhart Rd., there ain’t no name for this road. I was easing through some ears parked on this road and when I was passing Alan, he started cussing me again. I stopped my car and got out, I told him ‘that’s the third time you cussed me out, I don’t want to hear it no more,’ to cut it out. I got my shotgun out of the car cause I figured he would move on and leave me alone. I had a single barrel 20 gauge shotgun. I told him to go on and leave me alone, Alan said, ‘Nigger, you ain’t bad just cause you got a gun.’ Alan reached up under his seat like he got something out but I couldn’t see nothing. I told him not to come out of the car with nothing. There were two boys W.E.H. W.E.H. sitting in Alan’s car, crossed in front of my ear and went in ‘Bee’s’ yard. Alan opened the door to get out and I *238 shot him in the leg. Alan didn’t get plumb out of the door, I guess when I hit him it knocked him back. Alan shut the door and took off in his car and stopped at Lockhart’s Grocery and I haven’t saw him no more. I got in my car and went to the ball diamond. After I shot Alan, I reloaded my shotgun right there. I played cards till the ballgame started about four and I was there when the officers came, one was Mr. Grubbs and another, I didn’t know his name. W.E.H. “I HAVE READ THIS STATEMENT CONSISTING OF 3. PAGE(S), AND I AFFIRM TO THE TRUTH AND ACCURACY OF THE FACTS CONTAINED THEREIN.
“THIS STATEMENT WAS COMPLETED AT 3:24 PM. ON THE 10 DAY OF May. 1976.
“WITNESS: Leon Greene
“WITNESS: Frank Crowell
Willie Edd Harden
Signature of person giving voluntary statement”
Appellant testified that he had seen the deceased on Friday and Saturday before the shooting took place on Sunday and that they had had some words, that he did not know why the deceased was upset unless it was because he saw his ex-wife in the car with appellant. He denied making any threats to kill the deceased the next time he saw him. He further testified that at the time the shooting occurred he saw a pistol in the hands of the deceased and it appeared to him to be a .22 caliber.
Several other witnesses testified as to the events leading up to and culminating in the shooting death of the deceased but none of them testified to ever seeing a weapon of any kind on the person of the deceased or in his automobile.
Appellant contends that his confession should not have been admitted into evidence because he did not understand the waiver of rights form and did not understand the statement he signed. He admitted that he could read and write and admitted that he was given his constitutional rights before he was interrogated and admitted he signed the confession and also initialed each page and that no threats, promises, rewards or other inducements were made to him by the officers at any time prior to or during the time he gave and signed the statement.
An extrajudicial confession is prima facie involuntary and inadmissible, and the duty rests in the first instance on the trial court to determine whether the confession is voluntary, and unless it so appears, it should not be admitted. The trial court made that determination in this case and the confessory statement was properly admitted into evidence. Myhand v. State, 259 Ala. 415, 66 So.2d 544; Duncan v. State, 278 Ala. 145, 176 So.2d 840; Humphrey v. State, 54 Ala.App. 62, 304 So.2d 617.
The law is well settled that when one kills another by the intentional use of a deadly weapon, malice, design and motive may be inferred without more and are presumed, unless the evidence which proves the killing rebuts the presumption; and casts on the defendant the burden of rebutting it, and to show self-defense or other justification, if he can. See Kemp v. State, 278 Ala. 637, 179 So.2d 762, and the many cases therein cited.
In this case the trial court charged the jury on all four degrees of homicide and this, under the facts presented by this record, was more than appellant was entitled to under the circumstances.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. Accordingly, the judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.