Appellant was convicted of murder in the first degree and the jury fixed his punishment *Page 1349 
at life imprisonment in the penitentiary. Prior to arraignment the Court determined that appellant was indigent and appointed counsel to represent him. At arraignment he interposed a plea of not guilty. After sentence was imposed, he gave notice of appeal and was furnished a free transcript. Trial counsel was appointed to represent him on this appeal.
The evidence presented by the State shows that on Saturday afternoon, January 25, 1975, appellant drove from his home in Tuscaloosa, Alabama, to the store of the deceased located on Highway 14 west of Sawyerville in Hale County, with the avowed intentions of robbing the store. The store was owned and operated by the deceased, Frank Dooley, a 64 year old white man. Appellant was a 25 year old black man and he testified that he intended to rob Mr. Dooley, and several days before the robbery he bought a .32 caliber pistol and a box of ammunition in preparation to effectuate the robbery. During the course of the robbery Mr. Dooley was shot and killed by the appellant.
There was no motion to exclude the State's evidence and there was no motion for a new trial. Appellant did request the affirmative charge in writing and this puts us to a recital of the evidence.
Appellant filed a motion to quash the jury venire on the ground of systematic exclusion of qualified blacks from the jury roll and the jury box of Hale County.
Systematic exclusion means a purposeful non-inclusion based solely on race, and the burden of proving discrimination by systematic exclusion is on the defendant. Purposeful discrimination may not be assumed or merely asserted, it must be proved. Mere statistical disparity between the number of blacks presumed eligible for jury duty and the number actually included in the jury roll does not of itself establish a primary inference of invidious discrimination. Cassell v.Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839; Akins v.Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692; Swain v.Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759; Beecher v.State, 294 Ala. 674, 320 So.2d 727.
The only testimony offered in support of the motion to quash the venire in this case was that of appellant's attorney and the Clerk of the Jury Commission. The appellant's attorney testified that there is a total of approximately sixty-six percent white people serving on the jury venire in a county that contains approximately seventy or more percent blacks. This testimony was no more than the personal opinion of this attorney and was not documented in any way. He further testified that of the sixty members of the jury venire drawn to try this case there were twenty blacks. Eighty jurors were drawn but most of the other twenty could not be found and several were excused for medical reasons. There was no testimony as to the racial make-up of these twenty persons.
Mrs. Rosalyn DeWitt, the Clerk of the Hale County Jury Commission, testified that she had served on the Commission for about three years. She stated that she sent a questionnaire and a card to be returned to the Commission, to every person in Hale County who was over twenty-one and under sixty-five years of age that the Commissioners thought met the qualifications set forth in the Code for jury duty. When the cards were returned, the members of the Jury Commission selected the ones that met the qualifications set out under the Code and they were put on the jury roll and into the jury box. She said the poll list of voters was used and also the tax assessor's records as there were some people who assessed property who were not on the poll list of voters but were still residents of the county. She further testified that the members of the Jury Commission would go out in the county and contact black people to ascertain the addresses of blacks who failed to return the cards she mailed to them. She stated that in her best judgment there were about twenty-two hundred persons in the jury box and that when they were putting names in the jury box, they *Page 1350 
didn't know whether these persons were black or white. She further stated that there was about a fifty-fifty percentage of both blacks and whites in the jury box. She further testified that she did not make a special effort to maintain a fifty-fifty ratio and didn't know what the ratio was until they were through compiling the list. She said this method was approved by the Federal Court.
The Clerk of the Jury Commission further testified that during her tenure the Jury Commission was operating under a Federal Court order and they had people from the Justice Department who assisted them in compiling the list of qualified persons for jury service. She stated that they fully complied with the Court order and are still using the same system as ordered by the Federal Court. She said the Jury Commission meets once a year and reworks the jury roll and the jury box and new names are added. The only persons removed from the jury roll and the jury box are those over sixty-five years of age or those who have died or moved out of the county.
The Clerk further testified that one of the members of the Jury Commission who lived in the northern part of the county took a list of black people who had failed to return the cards mailed them and interviewed a number of black persons in an effort to locate those who did not return the cards.
During this hearing the trial court made the statement that a number of jury venires drawn for the terms of court since the Federal Court order were made up with seventy-five percent blacks and this was the result of random drawing from the jury box.
It is of significant interest to note that appellant did not call a single member of the Jury Commission to testify in support of his motion to quash the jury venire.
Under Swain v. Alabama, supra, and Butler v. State, 285 Ala. 387, 232 So.2d 631, and the other cases cited in this opinion, we hold that appellant did not meet the burden of proof cast upon him to show "the existence of purposeful discrimination" by the exclusion of Negroes on account of race from jury participation.
We will summarize the testimony presented by the State and also the testimony presented by the appellant.
Around 2:00 p.m., on January 25, 1975, young Robin Massey together with his father, Mr. Richard Massey, drove to the store of the deceased and young Massey was told to go in and buy some cheese. When he entered the store, he saw the deceased and a Negro man. The Negro man was sitting on the corner of a drink box. He told the deceased how much cheese he wanted and the deceased went to the rear of the store and got a knife to cut the cheese from a hoop. Young Massey observed the Negro walk toward the back in the same direction that the deceased had gone. Massey then went to a cake rack and to the drink box and got himself a soft drink. He saw the deceased approaching the front of the store with a shotgun in his hand and heard him exclaim, "Get out of my store before I kill you. Get out of my store before I kill you," and the deceased told young Massey to go out of the store and get him some help. Young Massey ran out of the store to his father's truck and told his father that a robbery was in progress in the store. His father told him to load his rifle. There was a 30.30 rifle and a .410 shotgun in the pickup truck at that time. As young Massey was loading the rifle he heard two shots and a loud blast that appeared to be coming from the back of the store and then he heard several other shots. Moments later the deceased appeared at the door and collapsed on the floor. The Negro man appeared at the door and pointed the pistol at young Massey and his father and young Massey pointed the 30.30 rifle at the man standing at the front of the door to the store. The man jumped back in the store out of sight.
Mr. Massey started backing the truck so as to put his son in position to be directly in front of the entrance to the store and in *Page 1351 
doing so, backed into a ditch and the tires started spinning and he was unable at that point to get the truck into the position that he wanted to put it in in relation to the store. Young Massey saw the Negro man run out of the store to an automobile parked almost directly in front of the store. This was a yellow automobile with a black vinyl top and the Negro went to the passenger's side of this automobile and opened the door. The Negro then pointed the pistol again at young Massey and his father across the top of the car. Young Massey's father told him to shoot but not to kill the man. Young Massey fired a shot that struck the roof of this automobile and at that point the Negro got in the car and cranked it and started to leave.
Young Massey's father told his son to shoot the tire on the automobile that was moving away from the store and young Massey shot the tire and in doing so, also hit the rim of the tire. The Negro pulled out and got on the highway and left.
About this time Mrs. Dooley, the wife of the deceased, and her son, Wayne Dooley, came out of the residence which was located about 20 to 25 yards from the store and young Massey ran to the front door where the deceased had fallen and he turned around and told Mrs. Dooley and her son that Mr. Dooley was dead. Wayne Dooley went to his father and was going to get him in a vehicle and take him to the hospital but he felt his pulse and knew that his father was dead. He then ran in the house and got his gun and got into an automobile and started chasing the Negro who had shot Mr. Dooley. He went down Highway 14 toward Eutaw in Greene County and he passed the Negro who had done the shooting, off the highway onto a side dirt road, where he was engaged in changing his automobile tire. Wayne Dooley then went to a nearby store and called the Eutaw Police Department.
A radio dispatch was put out and was picked up by Officer Harvey Foster who was employed by the Department of Conservation. Also Officer Vernie Striplin, Assistant Chief of Police of the City of Eutaw, picked up the radio dispatch. Wayne Dooley talked to Officer Foster and told him that this yellow over black automobile had turned on Highway 43 headed toward Demopolis. Officer Foster gave chase down Highway 43. He came in sight of this automobile and turned on the blue light and the siren and the suspect's automobile picked up speed. Officer Foster clocked this car as going around 100 to 125 miles an hour, but he overtook him and stopped him. Just before the driver of the getaway car stopped, Officer Foster saw him hold a pistol out of the window on the driver's side. After the Negro stopped, he threw the pistol in some weeds across the highway and Officer Foster took him into custody. About that time Officer Striplin arrived at the scene. Officer Striplin took the suspect and placed him in the patrol car and returned him to the Eutaw Police Department. Officer Foster got the pistol from the place where it was thrown and gave it to State Trooper G.E. Gravelee of the Department of Public Safety, who came to Eutaw and he immediately advised the suspect of his constitutional rights by reading him the Miranda warnings from the card. He asked him if he wanted to make a statement, and the suspect said he did not.
Trooper Gravelee testified that after giving the suspect theMiranda rights and warnings, he asked him if he understood them and he said he did. These rights were given to the suspect in the presence of several officers.
According to Trooper Gravelee appellant signed the waiver of rights form and before he signed it, no one in the presence or hearing offered the suspect, who will hereinafter be referred to as appellant, any hope or made him any promises or threatened him in any manner and offered him no rewards or other inducements. Trooper Gravelee and the other officers took appellant back to his automobile. The door to the car was open and one of the officers saw a box of ammunition lying on the console. He picked up the box of cartridges and noticed that a side of the box had been *Page 1352 
torn off and twelve cartridges were missing from the box. At this point the officers closed the doors and sealed all the doors with some form of tape. It was towed to a garage in Greensboro, and the keys had been surrendered by appellant and the car was locked after it was sealed.
It was discovered that appellant had sustained a bullet wound in his shoulder and he was carried to the emergency room of a local hospital where Dr. Wallace C. McAdory administered first aid to him whereupon he was released to the officers and lodged in the Hale County Jail. All of this occurred on the Saturday afternoon of January 25, 1975.
While appellant and the officers were at the hospital appellant voluntarily made the statement to Trooper Gravelee that he did not intend to kill the man. Officer Gravelee testified that he did not interrogate appellant at any time concerning the facts of the case and had not asked him a single question before appellant made this statement, "I did not intend to kill the man."
The following Monday morning, January 27, 1975, Mr. C.H. Weber, who was employed by the District Attorney's Office as an investigator and who formerly had been an investigator with the Department of Public Safety, went to the jail in Greensboro and took appellant into an office where he interviewed him, but before asking him any questions he gave him the Miranda rights and warnings and asked him if he understood them and appellant told him that he understood his rights. Mr. Weber asked him if he was willing to give a statement and he said that he was ready to give a statement. Mr. Weber stated that no one in his presence or hearing threatened appellant or made him any promises or offered him any rewards or other inducements to get him to make a statement.
There was a voir dire hearing out of the presence and hearing of the jury and the court, after a lengthy hearing, determined that the statement given by appellant to Mr. Weber was freely and voluntarily made. The statement is as follows:
 "January twenty-seventh, Nineteen seventy-five, Monday, nine fifty-five a.m. The following voluntary statement of Warner Lee Rainer, twenty-five years old, address one twenty-eight Eighteenth Court East, Tuscaloosa, Alabama, as told to C.H. Chuck Weber, who identified himself to me as an Investigator for the District Attorney's Office, Fourth Judicial Circuit. What is your full name? Warner Lee Rainer. How old are you? Twenty-five. What is your date of birth? Four eleven forty-nine. What is your address? One twenty-eight Eighteenth Court East, Tuscaloosa, Alabama. How far did you go in school? Completed the eleventh and half of the twelfth. Are you married? Yes, I am. Do you have any children? Yes, a boy. How long have you been married? Four years this coming March. Can you read and write? Yes, I can. It is initialed at the bottom of the page `WLR.' Page three: `Were you in or around the Sawyerville area on Saturday, January twenty-fifth, Nineteen seventy-five? Yes, I was. When did you leave Tuscaloosa? I left about one thirty p.m. Did you tell anyone that you were going down there? No, I didn't. Did you know the name of the store where this took place? No, I didn't. How did you know the store was there? I have stopped in there before to get shells and something to eat when we go hunting. How long have you been hunting around the Sawyerville area? Ever since last hunting season. Was the gun you used yours? Yes, it was, a thirty-two revolver. How long have you had it? Almost a month. Where did you buy it? Handy Pawn Shop in Tuscaloosa. How much did you pay for it? Fifty-nine dollars. Page 4: Did you buy any cartridges for your gun? Answer: Yes, I did on Thursday or Friday. Question: Where did you buy them? Answer: At Mac's Bait Shop in Tuscaloosa. Question: Do you recall what time it was when you got to the store? Answer: No, I don't. Question: When you first got to the store, was there anyone there? Answer: *Page 1353 
Yes, there was. How many was there? There was three cars there. Did you wait until they left before you went in? Yes, I did, I left and drove toward Greensboro about a mile, turned around and came back to the store, the last car was leaving, I went towards Eutaw about two blocks, turned around and went back to the store and there were no cars there.
 I parked on the far side of the store near Highway Fourteen facing the store. Question: Where did you have the gun? Answer: On my left side in my waist band. Question: When you went in the store was there anyone else in there? Answer: No, just the man. It is initialed at the bottom `WLR'.
 "This is page five. "Where was he at? He was standing in front of the counter, leaning up against it. Warner, will you tell me what happened after you got in the store? Answer: I went to my right, I felt my gun slip. I grabbed it and pulled it out, pulled the hammer back, turned around and told him, `Don't make me kill you'; he replied he didn't have any money. I told him to go around and open the cash register. We both went around to the cash register. I stayed a couple of yards behind him and to keep his hands where I could see them and to move slow.
 "He opened the cash register, he began to get the money out, he reached to get a paper sack to put the money in and I told him to put it on the scale. After he laid it on the scale, I told him to get on the floor and put his hands behind his back. These people drove up in this truck. I told him to get up and wait on them just like nothing was happening.
 "I grabbed the money off the scale and put it in my pocket. I walked back by the scale and the meat counter, I put my gun in my right pocket. I went to the drink box to the right of the door. A boy came in about fourteen years old and asked for twenty cents worth of cheese. The man went back sliced the cheese, I walked back by the meat counter so I could keep an eye on him, I walked back to where he kept the cokes to make it look like I was buying one" — It is initialed at the bottom of this page `WLR' on the left side at the bottom. Page six:
 "I walked back down towards him and asked him did he know me, he said no, I told him he did.
 "I told him I was fixing to go out the store, and I told him don't come out behind me.
 "About this time he had the cheese in some paper and walked towards the front corner of the store. I was about where the cheese was and I saw him with the shotgun. I told him to put the gun down. He said he was going to kill me. I heard the man tell the little boy, `Go out there and tell the man to give me some help.'
"The man fired the shotgun at me. I was near the
 corner where the cheese was, I moved back to where the meat display case was and I shot over the shelf towards the front of the store. He moved back toward the front corner of the store. I was near the cheese and I shot, he hollered, ran to the door and fell.
 "I started to look for some polaroid shades which I had on when I first went in the store but I couldn't find them.
 "I went around where he was laying in the door for I was fixing to go out the door, I saw this little boy in a truck. He had a rifle pointed at the door. I heard a shot go off, I backed back into the store, I peeped back out the door, I saw him in the truck trying to get out of a ditch they were in. I broke and ran to my car, I opened the door, I squatted down trying to reach in and crank my car, the second shot" — At the end of the page near the left corner are the initials `WLR'.
"Page seven: `— caught me in the right shoulder.
 "I got the car started closed the door and backed out into the highway, and I noticed one of my tires was flat, so I drove down the highway looking for a place to change my tire, while doing this I reloaded my gun. About three-quarters of a mile I turned right onto a dirt road. I went about two cars off the highway, I *Page 1354 
laid the gun up on hood and changed my tire. After I got the tire changed I got back on the highway and went towards Eutaw. I drove until it felt like my recap tire was hitting my fender, I pulled over to check it, and a guy in a blue Volkswagen pulled into a store and started to point in my direction.
 "I got back into the car, I think I had the gun in my coat pocket and I took it out and put it on the seat, when I got to the intersection at Eutaw I went down Highway Forty-three. I drove down it a while, I didn't see anyone behind me, I looked in my rearview mirror and I saw a car coming pretty fast, I started to pull over but decided to keep on driving, while it got in good sight I recognized who it was, it wasn't the state, it was a policeman then I showered down on it, I guess I was going one twenty to one twenty-five, I looked back through my mirror and I was leaving him behind.
 "A lot of things went through my mind and I said `What the hell, they would have a road block', so I pulled off the road, I held the gun outside the
 window and got out, and threw the gun in the grass toward the man in' —. It is initialed in the lefthand corner `WLR'. Page eight: — `brown uniform.'
 "Another policeman drove up and told me to put my hands on top of the car and then searched me. Then he stepped back and told me to lay flat on the ground and put cuffs on me.
 "They put me in the car and carried me to the police station in Eutaw.
 "A State Trooper advised me of my rights at the police station.
 "I was taken to the hospital in Hale County, treated and then placed in the County jail. Signed, `Warner L. Rainer, one hypen twenty-seven hyphen seventy-five. Witness: C.H. `Chuck' Weber."
Dr. Richard A. Roper, an Assistant State Toxicologist conducted a post-mortem examination on the body of the deceased and he removed two .32 caliber slugs from his body which he turned over to Mr. Dale Bloomer, a Criminologist of the Department of Toxicology. Dr. Roper stated that the cause of death was the result of a gunshot wound that the victim received which penetrated the lung and the heart.
In the course of the investigation the people from the Crime Laboratory in Selma came to the store where the shooting occurred and where Mr. Dooley was killed and made an investigation in the presence of the Sheriff of Hale County and other officers. A .32 caliber slug was found on the shelf in the back of the store and this slug together with the two slugs removed from the body of Mr. Dooley were turned over to the Criminologist, together with the pistol used by the appellant for the purpose of making a ballistics test to determine whether or not these spent slugs were fired from appellant's gun. Mr. Bloomer testified to his qualifications in detail, as to his training and experience in conducting ballistics tests. He test-fired the pistol using three of the .32 cartridges that were in the box removed from appellant's automobile and he testified that all of the spent slugs were fired from the .32 Smith and Wesson pistol belonging to appellant, to the exclusion of all other weapons.
The State called Mr. Hank Hanley who lived in Northport, Alabama, and who was employed at Hanley's Pawn Shop located in downtown Tuscaloosa. This witness testified that on January 17, 1975, appellant signed an application to buy a pistol. Appellant had filed the application as this is a record required to be kept under the Federal Statute when purchasing firearms. A copy of the application was introduced in evidence without objection. Appellant applied for the purchase of a .32 caliber revolver.
The State called Allen L. McDuff as a witness who testified that he was the manager of Mac's Bait Shop in Tuscaloosa and from the business records required to be kept by Mr. McDuff, it was shown that appellant bought from this shop one box of Remington .32 caliber Smith and Wesson ammunition on January 23, 1975, just two *Page 1355 
days before he robbed and killed Mr. Dooley.
Without attempting to set out in detail the chain of possession of the various items recovered in this investigation of the robbery and killing of Mr. Dooley, suffice it to say that there is no missing link in the chain of possession relating to any items that were identified and introduced in evidence.
Mrs. Dooley testified that she left the store to go to their home close by to use the rest room; that while she was in the house she heard gunshots in the store. The first shots that she heard were in her judgment pistol shots and after hearing three or four of them, she heard a loud noise like a shotgun blast and then there were three or four more pistol shots. She looked out the window and saw a young boy running toward a truck and she went out the house with her son and found that her husband was lying in the front door of the store dead.
Michael Wayne Dooley, aged 25, testified that he was in his father's home on the day that he was killed; that he went in the house to get a sandwich and a cup of coffee; that as he entered the house he noticed an automobile parked in front of his father's store and the body of this car was yellow with a black vinyl top. He further testified that he heard several shots and in his judgment, they were pistol shots and that he also heard a loud blast and then heard two more shots that appeared to be muffled. That he ran out of the house and was told by young Massey that his father had been killed.
Appellant offered several witnesses who testified as to his good character. He also testified in his behalf. According to his testimony he lived in Tuscaloosa and that on the 25th day of January, 1975, he went to Mr. Dooley's store in Sawyerville in Hale County and the purpose of this trip was to rob Mr. Dooley. That he had purchased a .32 caliber pistol on January 17, and that on the 23rd day of January he bought a box of .32 cartridges. He stated that he was familiar with Mr. Dooley's store as he had stopped by there on one or two occasions previously to buy shells to go hunting, that on this particular afternoon he arrived there around 2 o'clock and that he saw several automobiles parked in front of the store and he drove on by and went up Highway 14, toward Greensboro, that he went about a mile or so and turned around and came back by the store. He saw one car still parked there so he kept going and after driving for approximately two or three blocks he returned and did not see any automobiles or other vehicles parked in front of the store so he stopped, got out and went in. That he had his pistol in his belt as he started in the store and he felt it slip and he pulled it out and pulled back the hammer and walked up to Mr. Dooley and told him, "I don't want to kill you." He ordered him to open the cash register and take out all the currency. Mr. Dooley got the currency out and started looking for a sack to put it in and appellant told him to put it on top of the meat scales. After the money was placed on the meat scales, he told Mr. Dooley to lie down on the floor and Mr. Dooley complied with his orders. He said that he had a shoestring in his pocket and he was going to tie Mr. Dooley's hands behind him so that he couldn't get up but at about that time he heard a vehicle drive up and stop, so he told Mr. Dooley to get up off the floor and wait on whoever was coming in and to act as if nothing was happening; that a young boy came in and ordered 20¢ worth of cheese and Mr. Dooley walked back to the meat counter to cut the cheese. That he had taken the money off the scales and put it in his pocket and he walked back to the drink stand where he could have a good view of Mr. Dooley and he went up to him and asked him if he knew him and Mr. Dooley told him no, that he did not know him, and he told him, "I am fixing to leave the store and I don't want you to come out behind me." He stated that after Mr. Dooley cut the cheese, he either dropped the knife on the floor or laid it on the counter and started toward the front when he picked up a shotgun. That he shouted at him to put the gun down and that Mr. *Page 1356 
Dooley did not make a reply but shouted to the boy to go outside and get some help.
He stated that he again hollered at Mr. Dooley to put the gun down and Mr. Dooley fired the gun in his direction. That he then fired his pistol in the direction of Mr. Dooley. He said the first shot was in the ceiling as he was trying to warn Mr. Dooley to put the shotgun down. Mr. Dooley did not put the shotgun down and he fired directly at him.
He testified that he knew that he shot at Mr. Dooley at least two times after he shot the first time in the ceiling, that he could not recall firing the fourth shot but that after firing the two shots directly at Mr. Dooley, Mr. Dooley started running toward the door and hollering for help and fell in the door on top of the single barrel shotgun that he had in his hands when he went toward the door.
He further testified that when he got to the door, he saw this young boy pointing a gun in his direction and he jumped back inside the store and then when he saw the truck had backed into a ditch, he ran to his automobile and got on the driver's side and got down in a crouched position and opened the door and it was at this point that he felt a wound in his shoulder. He denied that when he got to his car that he reached over the top of his car and pointed the gun in the direction of the truck occupied by Mr. Massey and his son. He did state that after driving away from the place he reloaded his gun and that after going some distance down Highway 14, he felt that one of his tires was flat and he pulled onto a dirt road to put on a spare and while he was parked there, he saw a blue Volkswagen pass and the person driving the Volkswagen pointed at him and then kept going. He said that at the place where he changed tires he threw away four spent .32 cartridges and then he reloaded his pistol in his car.
On both direct and cross-examinations appellant testified that he went into Mr. Dooley's store to rob him.
Appellant contends that he was denied due process of law in that the State of Alabama does not provide adequate compensation for lawyers who are appointed to represent indigent defendants. We do not consider this to be a due process matter, nor do we consider it to be a matter of constitutional law.
We agree that appointed counsel in indigent cases are underpaid at all levels of trial proceedings but this is a matter that should be addressed to the Legislature and not the courts.
Appellant contends that the confession he made to Mr. Weber was involuntary and inadmissible. We do not agree.
An extrajudicial confession, oral or written, is prima facie involuntary and inadmissible, and the duty rests in the first instance on the trial court to determine whether the confession is voluntary, and unless it so appears, it should not be admitted. Myhand v. State, 259 Ala. 415, 66 So.2d 544; Duncanv. State, 278 Ala. 145, 176 So.2d 840; Carter v. State,53 Ala. App. 43, 297 So.2d 175; Luschen v. State, 51 Ala. App. 255,284 So.2d 282.
As we have pointed out appellant was given the Miranda rights and warnings on two occasions after his arrest and before he was interrogated. The trial court conducted a voir dire hearing out of the presence and hearing of the jury before concluding the confession was voluntary.
The State laid the proper predicate for the introduction of the inculpatory statement. We hold that appellant knowingly and intelligently waived his right to counsel, and knowingly and voluntarily made the confessory statement. Embrey v. State,283 Ala. 110, 214 So.2d 567; Jones v. State, 292 Ala. 126,290 So.2d 165; Guenther v. State, 282 Ala. 620, 213 So.2d 679;Luschen v. State, supra.
Appellant voluntarily took the witness stand and his testimony corroborated, in the main, the confession he made and signed two days after the robbery-murder. He admitted that he drove from his home in Tuscaloosa to Mr. Dooley's store in Hale *Page 1357 
County with the intent to rob Mr. Dooley. There were some conflicts in his testimony with that of some of the State's witnesses but conflicting testimony is peculiarly within the province of the jury to resolve.
Appellant complains that the trial court erred in allowing the District Attorney to question one of his character witnesses as to where his son was and the witness replied that he was in Kilby Prison. Appellant contends that this was irrelevant and highly prejudicial to the rights of appellant. The short answer to appellant's contention is that he failed to object to this testimony and move that it be excluded. A proper objection in the lower court is necessary to preserve the matter for review on appeal. Crow v. State, 49 Ala. App. 155,269 So.2d 171; Daniels v. State, 53 Ala. App. 666,303 So.2d 166; Felton v. State, 47 Ala. App. 182, 252 So.2d 108.
Appellant also claims the trial court committed reversible error in permitting the District Attorney to ask appellant if he had a permit to carry a pistol. In Pattillo v. State,245 Ala. 192, 16 So.2d 303, the Supreme Court held that such evidence was permissible as going to show intent.
Appellant admitted that he drove all the way from Tuscaloosa to Dooley's store in Hale County for the avowed and expressed intent to rob Mr. Dooley. Appellant's testimony leads us squarely to the conclusion that the possession of a pistol permit would not have deterred him from robbing Mr. Dooley.
Appellant claimed self-defense. This has to be the most novel claim ever made in a robbery-murder charge. It is his contention that the robbery was a completed crime and when Mr. Dooley would not put the shotgun down on his orders but, on the contrary, fired at him he had a right to kill Mr. Dooley in self-defense.
We do not think appellant has a legitimate complaint to make in any respect. The Court charged the jury on the law of self-defense and also charged the jury on all four degrees of homicide. This was more, much more, than appellant was due under the law and the facts of this case. He was at fault in bringing on this difficulty and he certainly was not entitled to have the jury charged on manslaughter.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
AFFIRMED.
All the Judges concur.