312 So.2d 86

**Gary D. HOGUE, alias**

v.

**STATE.**

**6 Div. 766.**

Court of Criminal Appeals of Alabama.

April 1, 1975.

Rehearing Denied April 22, 1975.

Zeanah, Donald, Lee & Williams and Wilbor J. Hust, Jr., Tuscaloosa, for appellant.

William J. Baxley, Atty. Gen., Montgomery, and James L. Hunt, Sp. Asst. Atty. Gen., Tuscumbia, for the State.

TYSON, Judge.

The Grand Jury charged Gary D. Hogue in a three count indictment with assault with intent to ravish, assault with intent to rob, and assault with intent to murder one Ann Burnett. The Jury found the appellant guilty of assault with intent to ravish, and the court then entered judgment, setting sentence at twenty years imprisonment in the penitentiary. The appellant's motion for new trial was overruled.

The indictment arose from an incident which occurred on U. S. Route I–59 in Tuscaloosa County, Alabama, on December 5, 1973. Deputy Sheriff Hubert Hallman testified that, starting on December 6, 1973, his department conducted a patrol on I–59 between the points known as the Caffee Junction Exit and the Brookwood Exit.

The officers were looking for an orange Dodge or Plymouth. While on patrol, on December 12, 1973, at 3:25 p. m., Deputy Hallman saw what he described as a 1968 orange Plymouth on an overpass over I–59 at the Caffee Junction Exit. The car proceeded on the overpass and then continued in the north bound lane of I–59 toward Jefferson County. Officer Hallman stopped the car and said that he looked inside the car and saw a blue wiping towel, a blue-gray windbreaker jacket, a lunch box, a pair of safety shoes, and umbrella, and a hammer. The driver of this car was the appellant, who appeared to have been drinking. Appellant was taken to the Tuscaloosa County Jail where pictures of the interior and exterior of the car were taken. These pictures were introduced as evidence. Deputy Hallman also said that the jacket and towel were given to the State Toxicologist for analysis. He further testified that a search was made of the interior of the car and fingerprint tests were conducted.

Officer Hallman had also investigated the incident on December 5, 1973, at 3:35 p. m. He was taken by Mrs. Ann Burnett from the Brookwood Exit to the point where she said she was accosted. The spot was 2.2 miles from the Brookwood Exit. Mrs. Burnett knew the spot because the man who attacked her left her umbrella there.

The court then elicited from Deputy Hallman that the Caffee Junction Exit is northeast of the Brookwood Exit and they are twelve miles apart.

Mrs. Ann Burnett testified that she is a registered nurse, living in Northport, Alabama, and the mother of three children. She had a leave of absence from her job and had been attending school at the University Hospital in Birmingham, on December 5, 1973. She left Birmingham at 3:30 p. m. to return home. She was traveling on I–59 between the Caffee Junction Exit and the Brookwood Exit when a man driving an orange Dodge or Plymouth pulled up beside her. She stopped her car because the man had indicated to her that something was wrong. He stopped behind her, walked up to her car, and told her that something was wrong with her muffler. She did not get out while he looked under her car. He asked her for something to use to tie the muffler. She replied that all she had was an umbrella, and then got out to look herself. He was holding a blue rag up under the car. He told her he could use the umbrella to tie it. She gave him one of the prongs. He then grabbed her. He was behind her, but she had a good opportunity to see his face. He had her by the left arm which was bruised as a consequence. He told her, "Get in the car or I will kill you." Mrs. Burnett screamed, and at that moment noticed that he had a knife in his hand. He pushed her to his car, and she begged for him to release her. He replied that all he wanted was her money. She told him that it was in her car and for him to take it and let her go. However, he kept pushing her toward his car. She said that he opened the door on the passenger side of his car, and that she was still begging to be released. She stated that the next thing she knew she was running down the side

of the road. A car was coming and it stopped to let her in.

She further testified that she remembered that the man who attacked her had green eyes and that they were bloodshot. She also said that she remembered that his hands were large, strong, and were clean, but had grease in the creases.

Mr. Pilkerton, the driver of the car which had stopped, drove her down the road toward Tuscaloosa. When they reached the Brookwood Exit they saw a police radar set-up and stopped there.

On December 12, 1973, Mrs. Burnett testified that she attended a police line-up at the Tuscaloosa County Jail. She immediately recognized appellant as the man who stopped her and forced her back to his car.

On cross-examination she stated that the incident occurred between 4:00 p. m. and 4:30 p. m. She said that on December 5, 1973, she had told the police that the man had worn a brown jacket, but that she wasn't sure of the color. She also said she thought the license tag of the man's car began with the number 63. On recross-examination, a photograph of the orange car was exhibited to her which revealed the license tag number 58–18458.

Albert Pilkerton testified that he saw Mrs. Burnett running down I–59 on December 5, 1974. He stated that he stopped his car to render her assistance, and as he did so he saw an orange Plymouth or Dodge automobile "fishtail" out onto the highway from the side of the road. He testified that Mrs. Burnett was hysterical, and that he drove her down to the Brookwood Exit where he noticed some police engaged in a radar set-up. He said that he was not able to identify the person driving the orange car.

At this point in the trial a discussion was held in the judge's chambers, and out of the presence of the jury. Appellant objected to the testimony of the next witness, Miss Neva Watts. She was to testify to an incident which occurred on November 11, 1974, when she was stopped by a man in an orange Dodge or Plymouth on I–59. The man made her perform unnatural sex with him. Appellant allegedly was this same man. Appellant objected to her testimony, stating that identity could not be proved in this manner, and also that the offense committed against Miss Watts was not of a like nature to that offense which appellant allegedly committed against Mrs. Burnett. The State pointed out the similarities of the two incidents, and the Court agreed that the incident involving Miss Watts was admissible to prove the intent involved in Mrs. Burnett's incident. The trial court rules that Miss Watts' testimony was admissible, and that he was of the opinion that the identical sex crime need not be shown.

The State then called Miss Neva Watts to testify. On November 11, 1974, she was a student at the University of Alabama in Tuscaloosa. She had been at her home in Lineville, Alabama, for the weekend and was returning to school via I–59. At 4:30 p. m., about five miles before the Brookwood Exit, a man in an orange Dodge or Plymouth pulled up beside her automobile and indicated to her that something was amiss with her car. She stopped her car along the shoulder of the road. He stopped behind her. Miss Watts got out of her car, as did the man who had signaled to her. He first said that he suspected that something was wrong with her tire. He then told her that something had gone wrong with her muffler and asked her if she had something with which to tie it. She said she had nothing, whereupon he asked her to go back to his car to secure a hammer. She went back to his car and opened the passenger door. At that moment she turned around to find him behind her with a knife in his hand.

He told her to get into the car or he would kill her. He also told her that all he wanted was her money. She said that she had $5.00 in her car. He then told her that he would drive her down the road,

drop her, and return for the money. He then told her to get down on the floor-board of the car, and he slid over her to get under the steering wheel. He tied her hands as they drove down the road. She stated that the car's interior was black, that the gear shift lever was on the steering column, and that there was a solid front seat.

He drove for about two miles. He kept telling her to keep her head down or else he would kill her. At this time she told him that she thought he told her he would let her out. He continued to drive and asked her if he would not kill her, would she do anything he asked. She said that she would, and stated that he still had the knife on her. He stopped on the side of the road and asked if she would go to a clearing on the side of the road. She said she could not get over a fence there. The man then asked her if she would do anything he wanted in the car. He then drove on and made her get back onto the floor-board. He turned off on an exit to the highway. Miss Watts later determined this to be the Brookwood Exit. He turned left on the overpass and then right onto Route 11. He said if she had unnatural sex with him, he would take her back to her car, if not, he would kill her. He then made her lie down on the seat with her head in his lap and forced her to take his private part into her mouth. She further testified that on that day she was wearing a pants suit and a turtle neck sweater. While they were driving down Route 11, he unbuckled her pants and slipped her panties down. He then placed his hand on her private part.

Miss Watts testified that they had driven about three or four miles down the road and that it was about 4:45 p. m. and still bright. He then drove her back to her car. On the way back, he told her that he was a hardened killer and that if she told the police, either he or his friends would kill her. He let her out of the car on the north bound side of I–59, and she crossed the highway to her car.

On December 12, 1974, Miss Watts attended the line-up at the Tuscaloosa County Jail. She stated that she recognized one of the men as being the same man who stopped her. She testified that the man she recognized was the appellant.

On cross-examination she stated that the knife the man used was about four inches long, had a hook-billed point and was a pocket knife, not a kitchen-type knife. She also stated that at a preliminary hearing in this case, she had said that she saw a child's toy dump truck in the back seat of the car.

After Miss Watts was excused, appellant made a Motion to Exclude her testimony and a Motion for a Mistrial. A discussion of the motions was held out of the presence of the jury. Both motions were denied.

State Toxicologist, James C. Britton, then testified. He stated that he found no usable fingerprints in the car. He also said that an examination of the blue towel and the jacket revealed no evidence of seminal fluid stains. He did find human hairs in the car, but they did not match either those of Miss Watts or Mrs. Burnett.

Deputy Sheriff Hubert Hallman was called by the State. Through him a diagram showing I–59 and the Caffee Junction and Brookwood Exits was introduced. Appellant's objection to the admission of the diagram, on the ground that it was not drawn to scale and was therefore misleading, was overruled. The court stated that the diagram accurately showed the relationship between the exits and was admissible for that particular purpose. Hallman stated that it is 11.3 miles from the Caffee Junction Exit to the Brookwood Exit. The spot where Mrs. Burnett was attacked was between the two interchanges, 2.2 miles from the Brookwood Exit.

On cross-examination Hallman was asked if a knife was found when appellant was stopped on December 12, 1974. He stated that the car was searched, and that appellant was searched, but no knife was

found. Hallman testified that when he stopped appellant, he asked to go to the side of the road to relieve himself. This spot was later searched, but no knife was found.

Appellant then made an oral motion to produce any statements made by Mrs. Burnett or Miss Watts. The State claimed that it possessed no such signed statements. The motion was denied.

Officer Hamner was called to testify. He testified that Miss Watts took him to the spot where she said she was stopped by the man in the orange car. He stated that this spot was located between the Brookwood and Caffee Junction Interchanges, approximately four miles from the Brookwood Exit. The State rested.

Appellant's defense was that of an alibi. He claimed that he was elsewhere when the incidents occurred to both Mrs. Burnett and Miss Watts. Appellant's friend, Larry Chandler, testified first. He stated that on December 5, 1974, he was at his mother-in-law's home at Eastern Valley. Eastern Valley is ten miles from Bessemer, going north toward Birmingham. He testified that at 4:15 p. m. appellant came by to ask him if he wanted to ride to register at Jefferson State Junior College where they both attended. They talked for awhile and appellant left at 4:30 p. m. Chandler said the conversation took place in the driveway. His wife was present also. He further stated that appellant was dressed in work clothes.

On cross-examination he stated that Eastern Valley is actually on the Tuscaloosa side of Bessemer as opposed to the Birmingham side. He also testified that Eastern Valley is twenty or twenty-five miles from the Caffee Exit.

Chandler's wife, Beverly Johnson, testified next. She corroborated her husband's testimony.

Appellant then called his brother-in-law, Charles Williams. He stated that he came to appellant's house at 5:45 p. m., on December 5, 1974, to take appellant to Jefferson State to register. Appellant was there, and they drove to Chandler's house. He was not there so they went to appellant's parent's house to pick up some special water for appellant's infant child. They then returned to Chandler's and finding him still not there, they went on to school.

Elmyra Hardin Hogue, appellant's wife, was called next. She stated that her husband returned from work at 4:45 p. m. on December 5, 1974. He was dressed in blue jeans, a dark blue or gray long sleeve shirt, hard hat, and safety shoes. He was dirty. He ate supper, took a shower, dressed, and left for school with Charles Williams.

Mrs. Hogue also recounted the events of Sunday, November 11, 1974. She stated that her sister and husband from Georgia had visited them that weekend. They left for Georgia on November 11, at 11:00 or 11:15 a. m. Mrs. Hogue and her husband ate lunch at his parent's home, and at 1:00 or 1:15 p. m. he left the house to go to their mobile home to check the locks and feed the dogs. It is about a fifteen or twenty minute drive from their parent's home to this home. At 3:30 p. m. Mrs. Hogue called appellant to tell him to bring some things for the baby. He had decided to stay there to study for a test he had the next day. She testified that he returned to his parent's home at 4:45 p. m., watched television, and never left the house after that time. She also said that he had not been drinking. On cross-examination she stated that she owned the orange Plymouth.

Appellant's father, James W. Hogue, was called to the stand to testify. He stated that on December 5, 1974, at a little after 4:00 p. m. he saw his son in his car at a stoplight at Raymond Heights. This red light is one-half mile from Mr. Hogue's house. The light is also situated on the street where Larry Chandler lives. He

corroborated appellant's wife's story with regard to the events of November 11, 1974.

On cross-examination, he testified that he also saw his son at about 6:15 p. m. on December 5, 1974, when appellant came by on his way to school to get some special water for their baby. He further said that it takes seventeen or eighteen minutes to drive from his home in the Eastern Valley section to the Caffee Exit. He further said that it takes "a good" forty minutes, driving between forty-five and sixty miles per hour to go from Eastern Valley to the Brookwood Exit on I–59.

Charles Williams was recalled by the State for cross-examination. He said that he did not remember whether he told Officer Hamner all the details to which he testified earlier when he was interviewed by Hamner on December 16, 1974.

Elizabeth Hogue, appellant's mother, corroborated the testimony already given regarding the events on November 11, 1974.

Out of the presence of the jury, appellant made a Motion for a Mistrial. The previous evening, the *Tuscaloosa News* carried an article about the trial. Appellant contended it was prejudicial and contained erroneous information. The jury had been permitted to return to their homes under proper instructions by the trial judge not to discuss the case or permit it to be discussed in their presence. The motion was overruled and the jury returned. The judge asked if any jury members had read the article. Four of them said they had either read it or scanned it. Each of them said they could still render a fair and impartial verdict based upon the evidence adduced at trial. The court then instructed the jury that the article was not evidence in the case and for them to disregard it entirely.

Appellant then testified in his own behalf. He stated that he was twenty-five years old and worked for the United States Steel Corporation at their Fairfield Works plant. He was a Marine veteran and had served in Vietnam for one year.

On December 5, 1974, he left work at 2:54 p. m. He drove from the Fairfield Works to Newton's Service Station and purchased some gasoline at 3:20 p. m. He then drove to the Food Giant store on Route U. S. 11 and bought some items. He then went to Larry Chandler's home at Raymond Heights. He arrived there at 4:05 p. m. He was not in, so he went to Chandler's mother-in-law's home, approximately five miles distance. He got there at about 4:15 p. m. and found Chandler and his wife in the driveway. Chandler came to appellant's car, and they discussed plans for registering at school later that evening. Appellant waved to Chandler's wife who remained in their car. Appellant left there at about 4:30 p. m. He went straight home.

He reached his mobile home at 4:45 p. m. He ate, showered, and dressed for school. Charles Williams came for him at 5:45 p. m., and they went to Chandler's home, but did not find him in. They then went to appellant's parent's house for some special water for the baby. They left there at 6:05 p. m., and checked at Chandler's house again, then went on to school.

Appellant stated that he did not stop Ann Burnett, and that he had never seen her.

On November 11, 1974, appellant's sister-in-law and her husband had visited with them. They left at about 11:00 or 11:15 a. m. Appellant stated that after eating lunch at his parent's home, he left for his home at 1:00 or 1:15 p. m. to check the locks and feed his dogs. He did so, and at 3:30 p. m., his wife called to tell him to bring some things for the baby. He stayed at his home to study until 4:30 p. m. He left and got the items. He returned to his father's house at 4:45 p. m. and watched television for the remainder of the evening. He stated that he did not stop Miss Neva Watts, nor had he ever seen her.

Appellant also said that he owns two knives. One has a six and one-half or seven inch blade. It is called a survival knife, and it is similar to a hunting knife. The other is a short knife which he keeps in his tool box. It has a chrome blade, a highly polished natural wood handle and has tar stains on it.

On December 12, 1974, appellant said he left work early because he was troubled over the death of a small child in his wife's family. He said he just wanted to drive around for a while. He first stopped in Ensley at a Quick Stop store, and bought three cans of beer. He drank two of them and threw the remaining can away. At about 3:00 p. m. he was arrested by Officer Hallman on I-59.

While appellant was being cross-examined by the State, the prosecutor was holding a document. Appellant requested permission to see it. The court determined it was a transcription of an interview of appellant conducted by Officer Hamner. Appellant was granted a copy of it. The paper was admitted into evidence without objection.

Appellant then presented fourteen character witnesses. They all stated that appellant enjoyed a good reputation in the community for good character.

Officer Hallman was called by the State as rebuttal witness. He stated that it is thirty miles from the Brookwood Exit to appellant's home.

After the court's oral charge and the giving of five of appellant's written requested charges, the jury retired. At 7:00 p. m. one juror asked if "a mistrial" could be granted because the jury was not "anywhere near a decision yet." The court then stated that they could continue deliberation, or go to a hotel for the evening. The jury elected the latter. The judge explicitly instructed them not to discuss the case until court was in session the next day at 9:00 a. m. The exhibits were then locked in the jury room, and court was recessed for the day.

At 8:55 a. m. the following morning, the court stated that it had been informed that the jury had reached a verdict. He asked appellant's counsel whether he objected to receiving the verdict before 9:00 a. m. He replied no. The jury found appellant guilty of assault with the intent to ravish as charged in the indictment.

At a hearing on appellant's Motion for New Trial, the following transpired. Eddie Clements, an acting bailiff at appellant's trial, testified that at about 8:30 or 8:40 a. m., on the last day of appellant's trial, another bailiff, Sandy Sanders, came to him in the hallway in front of Judge Wright's courtroom. Sanders told Clements that he and his wife, also a sworn bailiff, had been with the jury all night, and that he was turning the jury over to him. Clements stated that no one was present in the courtroom, that neither the judge, State's attorneys, defendant, nor his counsel were there. Clements then took the jury to the jury room and locked the door. He did not speak to them, nor did they speak to him. No one else spoke to or contacted the jury. The next occurrence was when the jury notified him that they had reached a verdict. This was before court was convened. He also stated that it might have been closer to 8:00 a. m. when Sanders turned the jury over to him.

Sandy Sanders testified that he was the bailiff who had charge of the jury at the hotel. His wife assisted him. No one contacted the jury while they were in his charge.

I

Appellant asserts that the admissions into evidence over his objection and motion of the testimony of Miss Watts as to a prior sex offense allegedly committed by the appellant was reversible error. The trial court determined that this prior offense took place some twenty-four days

prior to the assault on Mrs. Burnett, which culminated in the indictment for which the appellant was on trial. The time of both assaults was mid to late afternoon, and they were on the same section of the Interstate Highway between Bessemer and Tuscaloosa. In fact, the alleged assaults took place less than two miles apart. In both instances the alleged assailant drove either an orange Dodge or a Plymouth automobile. In each instance the alleged assailant signaled to the lone woman driver that she was having trouble with her automobile. In each instance the woman victim was advised by the assailant that there was trouble with her automobile's muffler. In each instance the assailant attempted to borrow some item from the victim to fix this muffler. Each victim stated that the assailant first seized her, stating that he wanted only money, and then forced each woman at knife point to the direction of his automobile.

In the case at bar, the appellant's defense was that of alibi. Both Miss Watts (prior assault) and Mrs. Burnett (case at bar) positively identified the appellant as their assailant. Therefore, the identity of the assailant was very much an issue at trial. Likewise, the intent with which the alleged assault was done, was also an issue.

■ While the general rule is that separate and distinct offenses are not admissible on trial of a party accused of a particular crime, Gassenheimer v. State, 52 Ala. 313; Jackson v. State, 229 Ala. 48, 155 So. 581; Davis v. State, 213 Ala. 541, 105 So. 677, nevertheless, there are several well-defined exceptions to this rule which are well-stated in Wilkins v. State, 29 Ala.App. 349, 197 So. 75. In *Wilkins*, both the identity of the assailant and his intent were at issue, as is present in this cause. Judge Simpson, later Mr. Justice Simpson, stated:

". . . It seems, however, to this court that such evidence does, profoundly, tend to shed light upon the intention of the defendant at the time he assaulted the prosecuting witness as well as aid in his identification.

. . . . . .

"Nothing more need be said, if Wigmore is to be deemed an authority on the question, and we regard him as pre-eminent. If, as stated by this eminent authority, *'where the charge is assault with intent* (to rape), the propriety of such evidence *cannot be doubted'* and if, as also stated by him, such evidence has 'probative value' for the purpose of showing 'the general desire to *satisfy lust* that is involved in this crime' and 'no particular woman is essential for this,' the only conclusion to which reason and logic bring us, is that the evidence of the collateral offenses in the present case, so closely connected in point of time, place, and race with the offense charged, was admissible. . . ."

In McKenzie v. State, 250 Ala. 178, 33 So.2d 488, defendant was prosecuted for the crime of assault with intent to rape. On the issue of the intent with which the assault was committed, the State introduced the testimony of a woman who was assaulted subsequent to the assault for which defendant was being tried. The court stated:

"So, in the case now under review, while the evidence of an alleged attempt to rape Mrs. Outlaw might have had a tendency to show the defendant to be a bad man, it was not admissible on this basis but as tending toward the criminal intent and negativing the innocent intent (or any other, such as a simple assault) as regards the act committed on Miss Eddins. And this principle is emphasized in the instant case by the further fact the proof as to the attack on Mrs. Outlaw followed the like pattern or technique as to Miss Eddins, that is, luring her to the same secluded spot and first making use of the pretense of a lost bracelet and the like. . . ." Authorities cited.

In Lee v. State, 246 Ala. 69, 18 So.2d 706, the testimony of the prosecutrix's two sisters that their father proposed to them to have sexual intercourse with him and that he placed his hands on their breasts and genital organs was admissible on the issue of intent in the prosecution of their father for the carnal knowledge or attempt to carnally know his daughter, a girl under the age of twelve years.

In Johnson v. State, 242 Ala. 278, 5 So. 2d 632, defendant was prosecuted for the rape of one Mary Sloan. Defendant's defense was an alibi. The only issue was that of identification. One Mrs. Wright was attacked the day before the assault being tried by a man she identified as appellant. Twelve days after Mrs. Sloan's attack, an attempt was made to rape Mrs. Harrison. She could not identify appellant, but her husband could. Also, seventeen days after the rape of Mrs. Sloan, a man attempted to rape a Mrs. Smith. Neither she nor her husband could identify the assailant. However, their neighbor, Mrs. Herring, saw a man she identified as appellant leaving the Smith's home by the means of a ladder. The testimony of all these witnesses was admitted to prove the identity of the assailant.

The facts of Sellers v. State, 41 Ala. App. 612, 145 So.2d 853, are very similar to those of *Lee,* supra. This court held there that defendant's prior sexual activities with prosecutrix's sister were admissible in the father's prosecution for carnal knowledge of his eleven year old daughter.

Also, in Mitchell v. State, 45 Ala.App. 668, 235 So.2d 917, appellant's prior sexual assaults on other girls were admissible in a prosecution for carnal knowledge of a girl under the age of twelve years. This court, through former Presiding Judge Price, rested its decision on the Brasher v. State, 249 Ala. 96, 30 So.2d 31; *Johnson,* supra; and *Wilkins,* supra, cases.

In the recent case of Humphry v. State, 54 Ala.App. 62, 304 So.2d 617, defendant was prosecuted for the rape of a student at the University of Alabama at Huntsville. Defendant's defense was an alibi. The prosecutrix was raped on January 3, 1973. She positively identified appellant as her assailant. On December 23, 1972, another girl was raped by a man she identified as appellant. Still another girl testified that on February 11, 1973, she woke up around midnight and saw a man standing about five feet from her, and before she could scream the man was on top of her. He tried to kiss her and put his hand between her legs. Then he put his hand behind her neck and said that he would break her neck. He put her on the floor and then got up without accomplishing his purpose. She could not identify him but did identify the car in which he drove off. This description matched that which appellant's brother gave of appellant's automobile. This court, through Judge Harris, held that the admission of the two girls' testimony was not error.

In the case at bar, we are of the opinion that the similarity in circumstances of time, place, and method of operation between the assault upon Miss Watts and the assault upon Mrs. Burnett is great.

We therefore hold that the trial court properly admitted the evidence of the prior assault on Miss Watts. Cases cited herein. See also 77 A.L.R.2d 841. Given the testimony of Miss Watts on the issue of the appellant's intent and identity, we are of the opinion that the trial court's rulings are correct.

II

The issue of the sufficiency of the evidence is properly before this court by virtue of appellant's Motion for New Trial and the written request for the affirmative charge. The elements of assault with the intent to rape or ravish include all the elements of rape except the consummation of the sexual act. The elements are an intent to have intercourse with a woman by force or fear and against her con-

sent. Smith v. State, 36 Ala.App. 209, 55 So.2d 202, cert. denied with opinion, 256 Ala. 444, 55 So.2d 208; Kelsoe v. State, 50 Ala.App. 378, 279 So.2d 549, cert. denied 291 Ala. 786, 279 So.2d 552; and Williams v. State, 51 Ala.App. 1, 282 So.2d 349, cert. denied 291 Ala. 803, 282 So.2d 355.

■ The intent to rape has also been described as a condition of mind coupled with an effort of force to carry out the desire over the physical resistance of the victim. The evidence must be sufficient to show that such acts of the defendant were of the nature that there will be no reasonable doubt of his intentions to gratify his lustful desires against the consent of the female and that the act would have been carried out but for the resistance of the female or some outside force which caused him to desist. Curry v. State, 23 Ala.App. 140, 122 So. 303; and Lewis v. State, 35 Ala. 380. To justify a conviction of assault, with the intent to ravish, the evidence must show that the acts and conduct of the defendant leave no reasonable doubt of his intention to gratify his lustful desires against the consent of the female not withstanding resistance on her part. Gilbert v. State, 28 Ala.App. 206, 180 So. 306; and Wilson v. State, 22 Ala.App. 554, 117 So. 615. There is no requirement of physical abuse to the genital organs. Smith v. State, 256 Ala. 444, 55 So.2d 208.

■ Given the testimony of Miss Watts on the issue of appellant's intent and identity, we are of the opinion that the evidence was sufficient for the jury to find that appellant was guilty of assault with intent to ravish.

### III

■ Appellant contends that irregularities occurred during the jury's deliberation. At the hearing on appellant's Motion for New Trial, the testimony of the two bailiffs, in whose charge the jury was placed, was taken. Both stated that the jury was not subjected to any outside influence or contact. Both bailiffs stated that no member of the jury discussed the case with anyone, including themselves. Upon arrival at the courthouse, the jury was transferred from one bailiff to the other, and were locked in the jury room until court was reconvened. No prejudice was shown to appellant by virtue of the jury's announcement of its reaching a verdict before 9:00 a. m. on June 7, 1974, when court was to have been reconvened.

We are of the opinion that the appellant's rights were here protected and that no injury resulted. Thus, the Motion for New Trial was properly overruled.

### IV

■ Appellant alleges error in the court's instruction to the jury that they may consider that appellant had an interest in the outcome of the case when weighing his testimony. A defendant does have an interest in the result of his trial and this interest may be considered by the jury. Bryer v. State, 34 Ala.App. 561, 42 So.2d 496, cert. denied 252 Ala. 609, 42 So.2d 500; and Williams v. State, 22 Ala.App. 489, 117 So. 281.

We have examined this entire record, as required by law, and find no error therein. The judgment is due to be and the same is hereby

Affirmed.

HARRIS, DeCARLO and BOOKOUT, JJ., concur.

CATES, P. J., concurs in result only.