The appellant was indicted for the murder of her ex-husband, James Barney Cooner by shooting him with a pistol. The jury found the appellant guilty of murder in the first degree and fixed punishment at life imprisonment. Thereafter, the trial judge set sentence accordingly. The appellant made timely motion to exclude the State's evidence, request for the affirmative charge and motion for new trial. The trial judge denied each motion.
The trial commenced with the voir dire examination of Sergeant William T. Gaut. Sergeant Gaut testified that, in response to a telephone call from Attorney Maurice Bishop, received by his partner, Sergeant Albert Wallace, he (Gaut) and Wallace went to Mrs. Hazel Kontos' home at 936 So. 54th Street, Birmingham, Alabama, on November 15, 1976. Upon arriving at this address, the officers met Mr. Jerry Colvin, who identified himself as an attorney from the office of Mr. Bishop. Mr. Colvin waited in the yard while the officers went to the front door and knocked. Mrs. Kontos answered the door. The officers then identified themselves, and Mrs. Kontos said, "The corpse is in there" (R. p. 50). According to Sergeant Gaut, he asked Mr. Colvin to enter the house with the officers, at which point the three of them entered. Sergeant Gaut stated that he went to a hallway leading to a bedroom in the back of the house. In the doorway to the bedroom he saw a large bundle which appeared to be a body wrapped in a gold drapery. Sergeant Gaut recalled that the smell of decaying flesh permeated the house. Sergeant Gaut returned to the front hallway where Mrs. Kontos was seated with Mr. Colvin. At this point Sergeant Gaut informed Mrs. Kontos that she was under arrest and read to her from a standardized card her Miranda rights. In response, Mr. Colvin stated that Mrs. Kontos would not make a statement at that time.
Near the front door in the seat of a chair a nickel plated pistol with a pearl handle was found. Sergeant Wallace asked Sergeant Gaut who owned the pistol (R. p. 40). Mrs. Kontos replied, "That pistol is mine" (R. p. 47). Sergeant Gaut recalled that Mr. Colvin told Mrs. Kontos not to say anything further. In the living room, underneath a chair, on the floor, another pistol was found, this one in a cocked position. Sergeant Wallace asked Sergeant Gaut how this pistol got there. Again, Mrs. Kontos blurted out, saying, "I put it there" (R. p. 48).
Sergeant Gaut testified that he was present at Cooper Green Hospital at about 2:00 p.m., on November 15, 1976, when an autopsy was performed on the deceased. *Page 1028 
Sergeant Gaut indicated that Mrs. Kontos identified the corpse as James Barney Cooner, her ex-husband (R. p. 53). The State introduced numerous photographs during Sergeant Gaut's testimony on voir dire examination. Some of these photographs had been taken at the scene while others were taken during the autopsy. At the close of the voir dire examination, the trial judge ruled that certain photographs were inadmissible, but allowed others into evidence. All three of the statements made to the officers by Mrs. Kontos while she was at her home were ruled admissible. However, the trial judge ruled inadmissible a statement made by Mrs. Kontos on November 16, 1976, to Sergeant Gaut while she was in custody at the City Jail, but without her counsel being present (R. p. 102). The statement, which was neither recorded, transcribed, nor signed, contained a confession of the killing in substantial detail (R. pp. 59-60). Although ruled inadmissible during the State's case in chief, the substance of the statement ultimately came into evidence on rebuttal by the State (R. pp. 743-744).
Voir dire examination concluded, the Judge called the jury into the courtroom to hear testimony of the State's first witness, Wayne Cooner. Mr. Cooner, the brother of the deceased, identified State's exhibit one as a photograph of the deceased.
Deputy Coroner Jack Parker testified that he was summoned to the home of Mrs. Kontos on November 15, 1976, arriving at 10:41 a.m. Mr. Parker took several photographs at the scene depicting the body as it was found. State's exhibit two was a photograph taken by Mr. Parker at the scene showing the body with the gold drapery partially removed, showing other layers of wrappings around the body. Mr. Parker testified that at the foot of the bed in the bedroom in which the deceased was found, a large roll of clear plastic material was found standing on its end.
Mr. Parker stated that he was present during the autopsy at Cooper Green Hospital. The autopsy revealed two apparent gunshot wounds to the head. Mr. Parker identified several photographs that he had taken during the autopsy. Mr. Parker observed a bullet being removed from the deceased's brain during the course of the autopsy. Mr. Parker sealed the bullet in a vial and delivered it to the evidence technician, Officer Crocker, in the Birmingham Police Department.
Chief Medical Investigator Jay N. Glass testified that he accompanied Mr. Parker to the appellant's home where he began an investigation of the death of the deceased. Mr. Glass later performed the autopsy on the deceased at Cooper Green Hospital (R. p. 130). Mr. Glass stated that the wrappings on the body were removed during the autopsy, layer by layer, with a dictated description and photographs taken of each layer. Mr. Glass identified the photographs of the body taken at the scene and those taken during the autopsy.
Mr. Glass was shown to possess the necessary qualifications to express his opinion as to the effect of injuries upon the human body. Mr. Glass testified that there were two apparent gunshot wounds of entry to the head of the deceased and one apparent wound of exit. Based on his experience and his examination of the body, Mr. Glass formed an opinion that these wounds were the cause of the deceased's death. Mr. Glass estimated roughly that the time of death was between twenty-four and forty hours prior to 2:00 p.m. on November 15, 1976. In his judgment, Mr. Glass stated that it was more likely that death occurred more than forty hours prior to the autopsy than that death occurred less than twenty-four hours prior to the autopsy.
Sergeant Albert Wallace testified that he received a call at Police Headquarters at 10:05 a.m. on November 15, 1976, from one identified to him as Attorney Maurice Bishop. The caller said that, if the police went to 936 So. 54th Street, the home of Mrs. Hazel Kontos, they might possibly find a dead body there. Upon arrival at the appellant's home, Sergeant Wallace and Sergeant Gaut met Mr. Jerry Colvin in the front yard. He identified himself as an attorney from Mr. Bishop's office. The *Page 1029 
remainder of Sergeant Wallace's testimony was substantially the same as the admissible part of Sergeant Gaut's testimony on voir dire. A number of photographs taken at the scene were identified by Sergeant Wallace and admitted into evidence during his testimony, including a photograph of the mattress in the bedroom where the deceased was found. The photograph showed a large red stain on the mattress which appeared to be blood (R. p. 161). Sergeant Wallace identified State's exhibits seventeen and eighteen as being, respectively, the nickel plated pistol with the pearl handle and the pistol found under a chair in a cocked position.
On cross-examination, Sergeant Wallace recalled finding some broken glass and a broken picture frame in the living room of the appellant's house (R. p. 195). During his on-the-scene investigation, Sergeant Wallace was called to testify in court on another case. His investigative involvement with the instant case ceased when he left the scene.
Evidence Technician Leonard M. Robbins testified that he was summoned to the appellant's address on November 15, 1976. He arrived about 10:45 a.m. with Officers Wyatt and Brown. Officer Robbins' duties during the investigation at the scene included taking photographs, collecting and marking evidence and diagramming the scene. Officer Robbins identified State's exhibit seventeen from his inscription as being the pistol that he photographed in a chair at 936 So. 54th Street. Officer Robbins "dusted" State's exhibit seventeen, but was unable to recover any recognizable fingerprints. Officer Robbins noted that the pistol, labeled State's exhibit seventeen, was a five-shot revolver which, when found, had one loaded cartridge and four spent cartridges in its chambers (R. p. 207). Officer Robbins similarly identified State's exhibit eighteen from his inscription as being the pistol found under a chair in the living room of the appellant's house. State's exhibit eighteen was a .38 caliber six-shot revolver which, when found, was fully loaded, and in a cocked position. A third pistol, State's exhibit twenty-three, was found partially under the bed in the other bedroom of the house. Officer Robbins identified this pistol from his inscription and also identified a photograph of the pistol taken as it was when found.
Officer Robbins identified a photograph of the wall next to the bed in the bedroom in which the deceased was found. The photograph, State's exhibit twenty-five, showed two bullet holes in the wall. Officer Robbins testified that he cut out a portion of the wall surrounding the bullet holes and recovered a bullet from the wall (R. p. 220). Officer Robbins listed numerous household articles, clothing (some men's clothing), etc., that he collected at the scene. All of the evidence that Officer Robbins collected was turned over to the property room at the Police Department where it was sealed in boxes marked for identification. The three pistols, the ammunition found in them, and the bullets recovered were turned in to Mr. Robert Johnson, weapons expert with the Birmingham Police Department, on November 19, 1976 (R. p. 272). Officer Robbins later recovered these items from Mr. Johnson and placed them in the property room at the Birmingham Police Department on December 14, 1976 (R. pp. 264 and 272).
Evidence Technician C.R. Wyatt identified two scale diagrams that he made showing the relative locations of the body, the pistols, the roll of plastic material, etc., within the floor plan of the appellant's house. Officer Wyatt stated that the diagrams were made from his measurements and observations at the scene on the morning of November 15, 1976. The diagrams were admitted into evidence.
Evidence Technician Jimmy S. Brown participated in the investigation of the scene at the appellant's house on November 15, 1976. Officer Brown identified a photograph taken of the wall in the bedroom showing two apparent bullet holes. Officer Brown stated that he helped in removing a section of the wall surrounding the hole which led to the discovery of the bullet (R. p. 322). *Page 1030 
Officer Brown stated that Mr. Colvin took him into the other bedroom of the house and showed him where to find a shoe box which contained a large sum of money in cash. Custody of the money, which totaled over $40,000.00, was taken by Mr. Colvin and a receipt given to the police.
Evidence Technician R.K. Crocker of the Birmingham Police Department testified that he was present at Cooper Green Hospital when the autopsy was performed on the deceased. Officer Crocker took several photographs during the autopsy which he identified. These photographs were admitted over defense counsel's objections. Officer Crocker identified a vial containing a bullet removed from the deceased's brain, which Officer Crocker received from Coroner Parker during the autopsy and later delivered to Mr. Robert Johnson.
Mr. Robert Johnson, Supervisor of Scientific Investigation, with the Birmingham Police Department, testified concerning the results of his ballistics comparisons in this case. When shown State's exhibits seventeen, eighteen and twenty-three, Mr. Johnson identified them from his inscriptions as the pistols he received from Officer Robbins on November 19, 1976. In Mr. Johnson's opinion as an expert in ballistics, State's exhibit seventeen, at that time, had been fired recently, but neither State's exhibits eighteen nor twenty-three had recently been fired.
Mr. Johnson testified further concerning the results of his test firings of the three pistols. Mr. Johnson compared test fired bullets from each pistol with the two evidence bullets that he received from Officer Robbins (bullet taken from bedroom wall) and Officer Crocker (bullet taken from deceased's brain). Based upon microscopic comparison of the lands and grooves in each bullet and upon his experience and training, Mr. Johnson concluded that State's exhibit seventeen (pearl handled, nickel plated pistol) fired the evidence bullets to the exclusion of all other weapons (R. pp. 351 and 357).
Sergeant William T. Gaut testified to substantially the same events as he had previously recounted on voir dire examination. Again, the Judge ruled that portion of Sergeant Gaut's testimony inadmissible which related to the appellant's statement to Sergeant Gaut made while she was in jail and without counsel present. The State rested at the close of Sergeant Gaut's testimony.
At this point the appellant's counsel moved to exclude the State's evidence on the ground that it was insufficient as to each charge in the indictment as a matter of law. The trial Judge overruled the motion.
The first witness for the defense was Dr. George S. Graham, a Birmingham physician specializing in internal medicine. Dr. Graham testified that the appellant had been his patient for twenty-five years. Dr. Graham stated that the appellant suffered from petit mal, a variant of grand mal, which is epilepsy (R. p. 466). During the course of his treatment of the appellant, Dr. Graham had prescribed medication which had been effective in preventing the occurrence of the mild seizures known to accompany the disease. Dr. Graham noted that a situation of extreme stress could bring on a seizure in the appellant which might result in loss of consciousness or memory.
Dr. Graham diagnosed another condition in the appellant, known as hypoglycemia or low blood sugar. This condition could produce symptoms such as a feeling of being very weak, nervous or shaky. However, these symptoms would be remedied by consuming nutritious food or drink.
Mrs. Hazel Kontos, the appellant, stated that she was fifty-six years of age. She had been married to Charlie Kontos for twenty-five years until his death in February of 1975. The appellant met the deceased in October of 1975, and they were married in January of 1976. The appellant obtained a final divorce from the deceased in July of 1976, having separated from him in April.
The appellant testified that sometime after Mr. Kontos' death she found a total of $100,000.00 hidden in the house. These *Page 1031 
funds were listed on the estate tax return for Mr. Kontos' estate. During the course of the appellant's marriage to the deceased, he was unemployed. The appellant worked as a beautician at Ja-Von's Beauty Salon.
On November 12, 1976, late in the afternoon, the deceased came to Ja-Von's Beauty Salon for a haircut and a manicure. After the appellant cut his hair, the deceased went to the front part of the salon for a manicure. While getting a manicure, the deceased had said that he intended "to perform kidney surgery" that night. Then he said he was going to go to Hawaii and never work again. At this point the appellant became frightened and left the salon via the back door. The appellant recalled that she drove home, changed into night clothes and went to sleep early on the sofa in the den, where she customarily slept.
It appeared from the record that the deceased had harassed the appellant on several occasions after their divorce. On one occasion about a month prior to November 12, 1976, the deceased called the appellant at work and threatened to kill her if she did not do as he wished. On this occasion, one of the appellant's customers moved her automobile from its customary parking space so that it was hidden. On another occasion, after their divorce, the appellant refused to admit the deceased into her home. With an ax the deceased broke windows and repeatedly chopped at the appellant's front door. The appellant ran to the home of her next door neighbors to escape the intruder, her ex-husband.
On the night of November 12, 1976, at about 11:00 p.m., the appellant was awakened by loud knocking on her front door. She went to the door and admitted the deceased. The appellant and the deceased then went back into the den where the deceased called her obscene names. At this point the deceased went back into the bedroom and returned with a pistol, the same being State's exhibit eighteen. The deceased cocked the pistol, placed it to the appellant's throat and threatened to kill her. The appellant recalled that the deceased held the pistol at her throat for about ten minutes. The entire confrontation lasted about two hours. During this time the deceased slapped the appellant in the face, forbade her from reading the Bible, smashed some religious pictures, and made offensive remarks about religious personages. The appellant was allowed to go to the bathroom, but the deceased insisted on accompanying her. Inside the bathroom, the deceased jerked a gold religious medallion from the appellant's neck and flushed it down the toilet (R. p. 519). Afterwards, they went back into the den.
Finally, the deceased went into the back bedroom, undressed and lay down on the bed to sleep. The appellant recalled that the deceased took the pistol, State's exhibit eighteen, with him to the bedroom. The appellant then got a pistol out of a drawer, went to the back bedroom and shot the deceased as he lay on the bed (R. p. 523). The appellant identified State's exhibit seventeen as the pistol she used. The appellant could not remember how many shots she fired. In fact, her memory was vague about events which occurred after the shooting. During the time between 1:00 a.m. on November 13, the approximate time of the shooting, and the morning of November 15, 1976, when the police arrived, the appellant could not account for her activities.
The appellant stated that, during the course of their marriage, she had given the deceased money on several occasions from the funds left to her by Mr. Kontos. The appellant purchased two vehicles for the deceased and financed a business venture that never materialized. The appellant estimated that she had given the deceased funds totalling $20,000.00 during and after their marriage (R. p. 543). The last time the appellant had given the deceased money was shortly before his death. The appellant recalled that she gave the deceased $1800.00, telling him to leave her alone.
On cross-examination, the appellant testified that, after her divorce from the deceased, she had bought groceries and cooked meals for him. A small note pad was identified by the appellant as containing her *Page 1032 
own and the deceased's handwritten notes to each other on several pages.
Dr. Creighton C. Farguson, Jr., testified that he was employed as company physician for the American Cast Iron Pipe Company during and after the period of the deceased's employment by that company. Dr. Farguson characterized his practice of medicine as a general practice which often functioned as a referral to company-retained medical specialists. During the course of his employment, Dr. Farguson observed and treated the deceased, James Barney Cooner. Dr. Farguson referred the deceased to the Kay Clinic for psychiatric treatment. Dr. Farguson diagnosed a mental illness in the deceased, known as paranoid schizophrenia (R. p. 598). Dr. Farguson explained that the deceased continually suffered from persecution complexes, thinking that everyone was against him. Dr. Farguson stated that this condition could lead to violent behavior in certain situations.
Dr. John D. Elmore, a psychiatrist, testified that he was employed by the Kay Clinic. During the course of his employment, Dr. Elmore observed and treated the deceased as a result of his referral from Dr. Farguson. Dr. Elmore first saw the deceased as a patient in 1968, but other psychiatrists in the Kay Clinic had seen him as early as 1959. Dr. Elmore diagnosed the deceased's condition in 1968 as paranoid schizophrenia. Dr. Elmore explained that the deceased's illness was chronic, tending toward cyclic alterations in its severity. The deceased's illness manifested itself in the form of occasional hostility to others or to his environment. Prescribed medication was effective in suppressing the hostility only when taken as directed. The medication was not curative in nature. At the time of the deceased's last visit to the Kay Clinic, in 1969, his condition was judged to have improved.
Vonda Rice, the appellant's employer, testified to the events of November 12, 1976, when the deceased came into the beauty salon for a haircut. Ms. Rice's account of those events was substantially the same as that of the appellant. Ms. Rice recalled that on other occasions the deceased had telephoned the beauty salon, using obscene language and threats when Ms. Rice had told the deceased that the appellant could not talk to him.
Mrs. Sara N. Crabtree, an employee at Ja-Von's Beauty Salon, testified to substantially the same events that occurred in the beauty shop on November 12, 1976, with reference to the conduct of the appellant and the deceased. Mrs. Crabtree recalled an occasion prior to November 12, 1976, when the deceased had telephoned repeatedly asking to speak with the appellant.
Nettie Hyatt, an employee at Ja-Von's Beauty Salon, testified that she gave the deceased a manicure on November 12, 1976, after the appellant had cut his hair. The witness' testimony concerning what occurred and what was said on that afternoon in the beauty shop substantially corroborated the testimony of the appellant, Ms. Rice and Mrs. Crabtree.
Mrs. Opal Brake and Mr. Homer Brake both testified that they lived next door to the appellant. During the marriage of the appellant and the deceased, Mr. and Mrs. Brake had on numerous occasions heard loud, profane and abusive language from a male voice inside the appellant's house. Both Mr. and Mrs. Brake recalled an occasion when the appellant had come to spend the night with them because she was afraid of the deceased. Mr. and Mrs. Brake testified that the appellant's reputation for truth and veracity in their community was good and that they would believe her under oath in a case in which she had an interest in the outcome.
Levene Brasher testified that she was married to the deceased from March, 1966, until July, 1967, when they were divorced. The witness testified that the deceased's reputation for violence, bloodthirstiness and dangerousness was bad.
Evelyn Bentley testified that she was married to the deceased from March, 1968, until April, 1969, when they were divorced. The witness testified that the deceased's reputation for violence, bloodthirstiness and dangerousness was bad. *Page 1033 
Teresa Bagwell testified that she was the daughter of Evelyn Bentley, who had previously testified. Ms. Bagwell was twelve years of age at the time of her mother's marriage to the deceased. Ms. Bagwell's testimony concerning the deceased's reputation was corroborative of that of Ms. Bentley and Ms. Brasher.
Jean Downey, a regular patron of Ja-Von's Beauty Salon, testified that she had known the appellant since September, 1975. Ms. Downey recalled an occasion shortly before November 12, 1976, when, as a result of a conversation between herself and the appellant, Ms. Downey moved the appellant's automobile from its customary parking space to another less conspicuous place.
The appellant next presented the testimony of eleven character witnesses. Each of these witnesses had known the appellant for many years prior to the death of her ex-husband. Each witness testified that the appellant's general reputation in the community was good and that the appellant had a reputation in the community for being a truthful, honest, peaceful and quiet person. Each witness stated further that he or she would believe the appellant under oath in a case in which she was interested in the outcome.
At the close of this character testimony, defense rested its case. The State then recalled Mrs. Levene Brasher to the stand as part of its case on rebuttal. On redirect examination, the appellant attempted unsuccessfully to introduce the divorce decree dissolving the marriage of J.B. Cooner, the deceased, and the witness then known as Levene Cooner.
The State next recalled, over defense counsel's objection, the appellant to the stand. On recross-examination, the State attempted unsuccessfully to go into the discussion between appellant and Sergeant Gaut at the jail on the day after her arrest when she did not have counsel present to advise her. The trial judge sustained defense counsel's objection.
The State recalled Sergeant Gaut to the stand. Sergeant Gaut was allowed to testify over objection that on the day after her arrest, the appellant voluntarily told Sergeant Gaut at the jail, after having been advised of her Miranda rights, that she had become fed up with the deceased's treatment of her, that she waited until the deceased was asleep and then went into the bedroom and shot him in the head, that after the shooting she pulled the sheet off the bed, pulled the body off the bed onto the sheet and wrapped the body several times, intending to dispose of it, but was unable to do so.
The final witness for the State was Mildred Battles, sister of the deceased. Through Mrs. Battles' testimony, the State sought unsuccessfully to have admitted into evidence a note pad which she found in the deceased's apartment after his death. The note pad had been identified earlier by the appellant through her recognition of the handwriting contained therein. The trial judge sustained the defense's objection to the introduction of the note pad.
At the close of the testimony of Mrs. Battles, the State rested its case on rebuttal. During closing argument by the defense, the State objected to a reference to the appellant as being the deceased's fifth wife. The trial judge sustained the objection.
 I
The first issue presented for our review concerns whether, as a matter of law, the trial judge should have granted the timely motion to exclude the State's evidence, which motion alleged that the State failed to make out a prima facie case. Specifically, the appellant points to the lack of sufficient evidence with respect to the requisite elements of premeditation and deliberation. In making its timely motion to exclude the State's evidence, request for the affirmative charge, and motion for a new trial, the appellant squarely presents the issue of the sufficiency of the evidence before this Court. Cf. Robinson v. State, Ala.Cr.App., 342 So.2d 1331.
The appellant contends that this Court's review of the trial judge's denial of *Page 1034 
the motion to exclude made at the close of the State's case is limited to consideration of the sufficiency of the evidence having been presented at that point in the proceeding and viewed in the light most favorable to the State. Williams v.State, Ala.Cr.App., 340 So.2d 1144, cert. denied, Ala.,340 So.2d 1149; Livingston v. State, 44 Ala. App. 559, 216 So.2d 731
(1968); Tooson v. State, 56 Ala. App. 613, 324 So.2d 327 (1975), cert. denied, 295 Ala. 426, 324 So.2d 333. We believe that the appellant's contention in this regard is a correct statement of the law, notwithstanding some early cases to the contrary. SeeBritton v. State, 15 Ala. App. 584, 74 So. 721 (1917); Sandlinv. State, 8 Ala. App. 396, 62 So. 386 (1913). The more recent cases cited in the appellant's brief are based on the rationale that a timely motion to exclude made at the close of the State's case, which is insufficient as a matter of law, entitles the defendant to be discharged at that point. To hold that the error, which occurs when a trial judge improperly denies a timely motion to exclude, can be cured by subsequent evidence presented by the defense is to hold that a trial judge can be put in error in denying a motion to exclude only when the defense subsequently fails to supply the missing elements of the State's case. Such reasoning would lead to the demise of the motion to exclude as a procedural corollary to the defendant's presumption of innocence and the State's burden of proof, and has, therefore, been several times rejected by the courts of this State.
The question to be decided is whether vel non the evidence presented by the State prior to the motion to exclude, if believed by the jury, would be sufficient to convince the jury beyond a reasonable doubt of the defendant's guilt. Randolph v.State, 100 Ala. 139, 14 So. 792 (1894); Morton v. State, Ala.Cr.App. (1976), 338 So.2d 423, cert. denied, Ala.,338 So.2d 428. It is apparent that much of the State's evidence in this case was circumstantial. However, it is well settled that circumstantial evidence may afford satisfactory proof of the corpus delicti in a murder prosecution, and, if facts are presented from which the jury may reasonably infer the crime has been committed, the question must be submitted to the jury.Scroggins v. State, Ala.Cr.App. (1976), 341 So.2d 967, cert. denied, Ala., 341 So.2d 972 (1977). See also, Young v. State,283 Ala. 676, 220 So.2d 843 (1969).
While mere speculation, conjecture, or surmise, will not authorize a conviction, the jury is under a duty to draw whatever permissible inferences it may from circumstantial evidence and to base its verdict on whatever permissible inference it chooses to draw. United States v. Strickland,509 F.2d 273 (5th Cir. 1975).
Unquestionably this case was close. However, it is clear from a careful examination of the State's case in chief that the facts and circumstances in evidence, as presented in this cause, were sufficient, as a matter of law, to require submission of the case to the jury. Specifically, we find the following facts and circumstances sufficient to support our ruling that there was no error in denying the motion to exclude:
1. The body of the deceased was found in the appellant's bedroom on the floor, wrapped in several layers of various material;
2. A roll of clear plastic, identical to that in which the body was wrapped, was found in the same bedroom;
3. A large red stain, which appeared to be blood, was found on the mattress of the bed in the bedroom where the body was found;
4. The cause of death was determined to be two gunshot wounds to the left side of the head (there was one exit wound on the right side of the head);
5. A bullet recovered from the deceased's brain and a bullet recovered from the blood-splattered wall adjacent to the bed were determined to have been fired from State's exhibit seventeen (pearl-handled, nickel plated pistol);
6. The appellant's statements to the police at the scene, to wit:
"The corpse is in there." *Page 1035 
"That pistol is mine." (the murder weapon)
"I put it there." (State's exhibit eighteen)
7. The fact that the police were first notified of the possibility of a homicide by the appellant's attorney, whose representative was also present when the police arrived at the appellant's home address; and
8. The discovery of several articles of men's clothing in the closets of the appellant's home, notwithstanding her divorce in July, 1976, about three months before the homicide.
The proof by the State on its case in chief of the above collateral facts and circumstances was sufficient for the jury to infer that the appellant committed the offense charged in the indictment.
 II
The appellant next asserts that, if this Court determines that the State's case in chief was sufficient as a matter of law, error to reversal occurred in refusing to give the affirmative charge and in denying the appellant's motion for new trial. The appellant argues that, as a matter of law, the killing of the deceased was in self-defense.
In Barnes v. State, Ala.Cr.App., 361 So.2d 390 (1978), cert. denied, Ala., 361 So.2d 396 (1978) this Court stated:
 "Briefly, the elements of self defense are (1) that the defendant must be free from fault in bringing on the fatal difficulty; and (2) that there must be a present impending peril to life or danger of great bodily harm, either real or so apparent as to impress on the mind of a reasonable person a reasonable belief of an existing necessity to take life, and the defendant must so believe; and (3) that a man as required by law must, though he may be free from fault and though he may be in danger, either real or apparent, of losing his own life or receiving serious bodily harm, flee or retreat if by retreating he could prevent the taking of life and not increase his own danger.
. . . . .
 ". . . It is elementary that one need not retreat from his or her own home. . . ."
The evidence in the instant case unquestionably establishes that the fatal affray took place in the appellant's home. It follows, then, that the appellant was not required by law to retreat from her assailant.
Whether vel non the first and second elements of self-defense listed above existed at the time of the killing must be determined from an examination of the testimony of the appellant, the sole witness to the shooting. The appellant contends that her uncontroverted testimony establishes that she was free from fault in bringing on the fatal difficulty. However, it is well settled that the jury is free to consider the interest of the appellant in the outcome of the case when weighing her testimony. Hogue v. State, 54 Ala. App. 682,312 So.2d 86 (1975); Bryer v. State, 34 Ala. App. 561, 42 So.2d 496
(1949), cert. denied, 252 Ala. 609, 42 So.2d 500.
The same reasoning is applicable with respect to whether the appellant believed that there was a present impending peril to life or danger of great bodily harm, either real or so apparent as to impress on the mind of a reasonable person a reasonable belief of an existing necessity to take life. In Wall v. State,49 Ala. App. 285, 270 So.2d 831 (1972), this Court stated:
 "In determining this question the jury is entitled to look at all the testimony offered by the State and the defendant. And even though the evidence of defendant with regard to the elements of self-defense may have been without dispute, its credibility was for the jury. They were not bound to accept it as true and to draw any inference of imminent danger or freedom from fault in bringing on the difficulty. In their discretion they had a right to reject it as they apparently did in the case at bar. Cooley v. State, 233 Ala. 407, 171 So. 725 (1937); Kemp v. State, 278 Ala. 637, 179 So.2d 762 (1965)." *Page 1036 
Therefore, we find no error either in refusing to give the affirmative charge or in denying the motion for new trial.
 III
The appellant contends that the trial judge erred to reversal in refusing to give the appellant's requested written instructions on self-defense and on the burden of proof. We are satisfied after a careful examination of the trial judge's oral charge that the refused charges were fairly and adequately covered by the oral charge. § 12-16-13, Code of Alabama 1975. Therefore, refusal was proper. Ingram v. State, Ala.Cr.App.,356 So.2d 761 (1978).
 IV
The appellant contends that the trial judge erred in sustaining the State's objection during the following excerpt from closing argument by the defense (R. p. 768):
 "MR. BISHOP: Let's take married life. The testimony in this record is undisputed that Hazel Kontos lived with Charlie Kontos, who enjoyed an unquestioned excellent reputation for twenty-three years of married life and until he died. Two wives of, she was Cooner's fifth . . .
 "MR. JOHNSON: Judge, I want to object. There has been no evidence about any . . .
"THE COURT: Sustained. Disregard that.
 "(Thereupon, Mr. Bishop continued addressing the jury. . . .)"
We find no evidence in the record showing that the appellant was the deceased's fifth wife. Furthermore, the evidence does not support the assertion concerning the reputation of Mr. Kontos. Therefore, we find no error in the trial judge's ruling. Smith v. State, 261 Ala. 270, 73 So.2d 916 (1954);Espey v. State, 270 Ala. 669, 120 So.2d 904; Nix v. State,32 Ala. App. 136, 22 So.2d 449 (1945).
We have carefully examined this record and find same to be free of error. The judgment is due to be and the same is hereby
AFFIRMED.
All the Judges concur.